Rodney Eugene WESTON  *v.*  STATE of Arkansas

CR 05-972                                                     234 S.W.3d 848

Supreme Court of Arkansas
Opinion delivered May 4, 2006

*Griffin, Rainwater & Draper, P.L.C.*, by: *Sandra C. Bradshaw*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Karen Virginia Wallace*, Ass't Att'y Gen., for appellee.

BETTY C. DICKEY, Justice. Rodney Eugene Weston appeals the order of the Circuit Court of Chicot County convicting him of capital murder, a terroristic act, and first-degree battery, for the death of Vincent Thomas and serious injury to James Collins. He

was convicted by a jury and sentenced to life without parole for capital murder, life for the terroristic act, and 240 months for first-degree battery. On appeal, Weston contends that the trial court erred by: (1) denying appellant's *Batson* challenge regarding the State's peremptory strikes of potential jury members; (2) finding that there was sufficient evidence to support his conviction of murder; (3) not finding him incompetent to stand trial. As appellant was sentenced to a term of life imprisonment, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(2). We find no error and affirm the decision of the trial court.

## Statement of the Facts

On April 24, 2004, Rodney Weston and his cousin, Derrick Weston, went to the Blue Front Tavern. There the victim, Vincent Thomas, was watching a game on television with three or four others, including his father, James Thomas, the operator of the tavern. James Thomas saw someone come into the front room and call for his son. Valerie Hall, a customer, heard something, followed Vincent toward the back of the tavern, and started to speak to him, but he told her to wait while he asked Rodney and Derrick Weston to leave. After a conversation between Rodney and Vincent, Derrick walked out of the door, followed by appellant. Hall watched Vincent walk to the door to close it and witnessed beer being splashed onto his face, followed immediately by three shots being fired. Vincent turned and ran to the front room as Hall hid behind the pool table.

James Thomas heard one or two gunshots before he saw Vincent run behind the counter and fall. Terry Allen, a customer who had also been sitting in the front room, heard gunshots and then saw Vincent run back to the front holding himself. After Vincent fell to the ground, Allen witnessed appellant come into the room with a gun and say, "Where that whore head nigger at?" When nobody answered, appellant shot several times. Allen ran out of the front door after appellant's second shot, but another customer, James Collins, partially paralyzed from a prior stroke, could not move as fast. Collins was struck by gunfire and appellant then ran out of the back.

Valerie Hall, still hiding behind the pool table in the back room, had witnessed appellant walk in a few seconds after the first shots were fired and go toward the front room. She heard about four more shots and then ran to hide in a different spot, behind the

DJ booth. After Hall saw appellant run out the back, she looked through a window into the front. Vincent Thomas was lying on the ground, and James Thomas was on the phone. Vincent Thomas had been struck by a bullet which had entered the left side of his back, traveled across his body, and exited under his arm. He died as a result of those injuries. James Collins survived, but had been shot in the right arm, abdomen, and leg.

Appellant ran to Danielle Johns's house and, after she had asked him several times what was going on, he said, "I just laid that nigger down." Johns then asked him who, and Rodney responded "Vin," whom she knew to be Vincent Thomas. When Johns asked appellant why, he said, "He didn't want to give me my money." Johns saw appellant holding a black gun while he was in her home. When later apprehended by officers, appellant had a forty-caliber Glock in his possession. Shell casings recovered from the Blue Front Tavern matched the gun that was in the possession of appellant. Appellant was convicted of capital murder, a terroristic act, and first-degree battery by a jury in Chicot County, from which he now appeals.

### Points on Appeal

Appellant argues that the trial court erred in denying his motion for directed verdict on the capital-murder charge because there was not substantial evidence of premeditation and deliberation. While Weston presented this issue as his second point on appeal, preservation of his freedom from double jeopardy requires us to examine the sufficiency argument before addressing trial errors. *Nelson v. State*, 365 Ark. 314, 229 S.W.3d 35 (2006).

We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *Cluck v. State*, 365 Ark. 166, 226 S.W.3d 780 (2006). We have repeatedly held that, in reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *Id.* We affirm a conviction if substantial evidence exists to support it. *Id.* Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Id.*

A person commits capital murder if, "[w]ith the premeditated and deliberated purpose of causing the death of another

person, he or she causes the death of any person." Ark. Code Ann. § 5-10-101(a)(4) (Supp. 2003). Weston argues that the State failed to prove the elements of premeditation and deliberation, thus the trial court should have granted his directed-verdict motion. He said that he did not know that any of the victims would be at the Blue Front Tavern that night, or that he had planned on going there. In contrast, he stated that he and his cousin went there to play pool as it was closer than a different pool hall. However, this court has long held that premeditation and deliberation are not required to exist for a particular length of time, and may be formed in an instant. *Davis v. State*, 365 Ark. 634, 232 S.W.3d 476 (2006). Furthermore, we have held that premeditation is rarely capable of proof by direct evidence and usually must be inferred from the circumstances of the crime. *Id.* Premeditation and deliberation may be inferred from the type and character of the weapon used; the manner in which the weapon was used; the nature, extent and location of the wounds; and the conduct of the accused. *Id.*

In this case, the evidence reveals that appellant either had a gun, or retrieved one, before he shot Vincent Thomas, as he was the only one identified as having a gun in Blue Front Tavern. Whether he had the gun the entire time he was in the establishment is irrelevant, as there was substantial evidence for the jury to conclude that appellant made a premeditated and deliberate choice to shoot and kill Vincent Thomas. Appellant was seen leaving, but seconds after he walked out of the back door, Vincent Thomas was shot as he was closing the door behind appellant. The victim was shot in a vital area, causing the bullet to travel across his body and exit. Officer Glen Anderson testified that the bullet holes did not appear to be random, rather were well-placed shots in a pattern. Furthermore, the appellant's statements as he chased Thomas through the bar, "where that whore head nigger at," and when he spoke to Danielle Johns, "I just laid that nigger down," were not words of remorse. Rather, they support the conclusion that it was a premeditated and deliberated act. Testimony that appellant had possession of the weapon that was used to kill Thomas, that appellant had a motive to kill him, and that the shots at Vincent were intentional and not random shots into the building provide ample evidence to support the jury's finding of capital murder with premeditation and deliberation. We therefore hold that the trial court did not err in denying appellant's directed-verdict motion.

Although it was presented as his first point on appeal, the second argument we consider is appellant's *Batson*[1] challenge, alleging that the State's nine of ten peremptory challenges were used to strike prospective African-American jurors from the venire for reasons that were not race neutral. This court has previously stated that we will not reverse a circuit court's ruling on a *Batson* challenge unless its findings were clearly against the preponderance of the evidence. *Owens v. State*, 363 Ark. 413, 214 S.W.3d 849 (2005) (quoting *Stenhouse v. State*, 362 Ark. 480, 209 S.W.3d 352 (2005)). In addition, we give some deference to the circuit court because it is in a superior position to determine juror credibility. *Id.* We have reiterated the procedure for determining if a *Batson* violation has occurred:

### Step One. Prima facie case.

The strike's opponent must present facts, at this initial step, to raise an inference of purposeful discrimination. According to the *Batson* decision, that is done by showing (1) that the strike's opponent is a member of an identifiable racial group, (2) that the strike is part of a jury-selection process or pattern designed to discriminate, and (3) that the strike was used to exclude jurors because of their race. In deciding whether a *prima facie* case has been made, the trial court should consider all relevant circumstances. Should the trial court determine that a *prima facie* case has been made, the inquiry proceeds to Step Two. However, if the determination by the trial court is to the contrary, that ends the inquiry.

### Step Two. Racially neutral explanation.

Assuming the strike's opponent has made a *prima facie* case, the burden of producing a racially neutral explanation shifts to the proponent of the strike. (But, again, the burden of persuading the trial court that a *Batson* violation of purposeful discrimination has occurred never leaves the strike's opponent.) This explanation, according to *Batson,* must be more than a mere denial of discrimi-

---

[1] In *Batson v. Kentucky,* 476 U.S. 79 (1986), the United States Supreme Court reversed and remanded an all-white jury's conviction of an African-American defendant for second-degree burglary and receipt of stolen goods. The Court held: "If the trial court decides that the facts establish, prima facie, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, our precedents require that petitioner's conviction be reversed." *Isom v. State,* 356 Ark. 156, 177, 148 S.W.3d 257, 271 (2004).

nation or an assertion that a shared race would render the challenged juror partial to the one opposing the challenge. Under *Purkett [v. Elem,* 514 U.S. 765 (1995) *(per curiam)*], this explanation need not be persuasive or even plausible. Indeed, it may be silly or superstitious. The reason will be deemed race neutral "[u]nless a discriminatory intent is inherent in the prosecutor's explanation." *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769. But, according to *Purkett,* a trial court must not end the *Batson* inquiry at this stage, and, indeed, it is error to do so.

*Step Three. Trial court decision on purposeful discrimination.*

If a race-neutral explanation is given, the trial court must then decide whether the strike's opponent has proven purposeful discrimination. *Purkett v. Elem, supra.* Though the United States Supreme Court has not elucidated precisely what is required at this step, clearly the strike's opponent must persuade the trial court that the expressed motive of the striking party is not genuine but, rather, is the product of discriminatory intent. This may be in the form of mere argument or other proof that is relevant to the inquiry. But it is crucial that the trial court weigh and assess what has been presented to it to decide whether in light of all the circumstances, the proponent's explanation is or is not pretextual. If the strike's opponent chooses to present no additional argument or proof but simply to rely on the *prima facie* case presented, then the trial court has no alternative but to make its decision based on what has been presented to it, including an assessment of credibility. We emphasize that following step two, it is incumbent upon the strike's opponent to present additional evidence or argument, if the matter is to proceed further.

*Owens,* 363 Ark. at 416-17, 214 S.W.3d at 851-52.

In its brief, the State presents an argument that appellant's *Batson* challenge was untimely, as it was not made until the end of jury selection, after all of the potential jurors had left the courthouse. However, this court has instructed that, because a "pattern of discrimination" must be demonstrated, we will regard a *Batson* challenge as timely so long as the objection is made before the jury is sworn. *Pacee v. State,* 306 Ark. 563, 567, 816 S.W.2d 856, 859 (1991). Appellant contends that the trial court ended the *Batson* analysis before determining the third step, whether he had proven purposeful racial discrimination. He argues that he was not given the opportunity to respond to the State and to persuade the court

that the State's expressed motive for the peremptory strikes was genuine. The State responds by stating that appellant never objected to the process used by the trial court and that the trial court did not err in denying the *Batson* challenge.

■ As the State did use nine of its ten peremptory challenges on African-American individuals, we conclude that at least an inference of discrimination was raised; therefore, the analysis proceeds to step two. Despite the fact that appellant did not make contemporaneous objections as the State was striking each of the nine African-American jurors, the State was able, on the morning after two days of voir dire, to provide the court with race-neutral reasons for each juror's being struck. From a combination of notes and memory, the State provided the following reasons for each strike:

> *Ruth Ferguson*: The State explained that it struck this potential juror because she was equivocal in her views on the death penalty. When asked to choose between two answers ("A" or "B") regarding her view on the death penalty, Ms. Ferguson refused to pick between "A" and "B", and stated that both A and B were her answers.[2] Further, the State noted that Ms. Ferguson had a son who was mentally retarded. Thus, the State feared that she would tend to sympathize with the defendant because he claimed to be mentally retarded and because she couldn't make up her mind about her position on the death penalty. (Note: Appellant offered no additional argument and the court found the reason for the strike to be race neutral.)

> *Stacey Cokely*: The State struck this potential juror because she was in special education herself and she acknowledged that she feared that she wouldn't be able to deal with the proceedings. The State declared that it had worried Ms. Cokely would sympathize with the appellant, who claimed to be mentally retarded. (Note: Appellant offered no additional argument and the court found the reason for the strike to be race neutral.)

---

[2] During *voir dire*, the State asked each of the potential jurors to state which of the following views of the death penalty better fit his or her views: ("A")-I believe the death penalty is appropriate in some capital murder cases and I could return a verdict resulting in death in the proper case, or ("B")-although I do not believe the death penalty should ever be imposed, as long as the law provides for it I could assess it under the proper set of circumstances. The State admitted at the close of the *Batson* challenge, however, that it had inadvertently failed to ask the question to one of the panels of potential jurors.

*Laura Stewart*: The State struck this potential juror because she knew appellant's mother. In addition, she had known the appellant when he was a small child and she knew several of his relatives. (Note: Appellant offered no additional argument and the court found the reason for the strike to be race neutral.)

*Alberta Dunbar*: The State struck this potential juror because she was a school teacher who had taught the victim. The State was concerned with people who knew the victim because there were some allegations that the victim had been engaged in the drug trade and that the dispute between the appellant and the victim involved drug money owed by the victim to the appellant. Additionally, the State explained that, although she later stated she could vote for it, Ms. Dunbar initially expressed problems with the death penalty. (Note: Appellant offered no additional argument and the court found the reason for the strike to be race neutral.)

*Arletta Gorins*: The State struck this potential juror because she was a school teacher, and the prosecutor felt that school teachers tend to be sympathetic to young people, like the appellant. The State also felt that she was "too chummy" with defense counsel during voir dire. (Note: Appellant offered no additional argument and the court found the reason for the strike to be race neutral.)

*Martha Jones & Donald Kincaid*: The State struck these potential jurors because they answered "B" to the State's question (explained in the footnote above) regarding their individual views on the death penalty. The State explained that answer "B" indicated, to the State, some reluctance to impose the death penalty. (Note: Appellant did offer some additional argument, discussed below, however the court found that the prosecution's reasons for these strikes were race neutral)

*Michael Talley & Betty Jean Dillard*: The State struck these potential jurors because they answered "B" to the hypothetical question regarding the death penalty. Additionally, the State recalled asking the court to remove Mr. Talley for cause because he was confused on the concept of premeditation. The State could not, however, remember any other reason for striking Ms. Dillard, as that strike had been made nearly 36 hours earlier.

Appellant presents several arguments to this court in response to the State's explanations. However, only two of the arguments were

argued to the trial court. *Batson* arguments not made to the trial court are not preserved for our review on appeal. *Owens v. State, supra.* Moreover, this court has noted that a general objection does not preserve a specific point. *See Howard v. State*, 348 Ark. 471, 79 S.W.3d 273 (2002).

■ The arguments that appellant did properly preserve for our review were presented to the trial court in response to the State's reasons for striking potential jurors Jones, Kincaid, Talley, and Dillard. After the State presented its reasons for striking Jones and Kincaid, appellant argued that the State had not exercised its strikes uniformly and alleged that two other jurors who answered "B" had not been stricken by the State. However, the State explained that it had failed to ask the hypothetical question to one group that could have included those two jurors, and that possibly they had not answered the question. In light of the State's further explanation, in addition to the fact that one of the jurors that appellant alleges was not struck after answering "B" was African-American, we find the trial court did not err by not finding purposeful discrimination by the State. After the State presented its reasons for striking Talley and Dillard, appellant argued that whether the potential jurors had answered "A" or "B," they both stated that they *could* execute appellant, if convicted, and could consider life without parole, which made them fair jurors. Furthermore, appellant argued that striking them simply because they chose "B" was merely a ruse to exclude African-American jurors. The State responded by explaining that any potential juror who answered "B," whether Caucasian, African-American, or some other ethnicity, was struck from the panel.

Appellant cites *Witherspoon v. Illinois*, 391 U.S. 510 (1968), to support his argument that just because potential jurors answered "B," they could still be good jurors, as they could consider life without parole and did indicate that they *could* execute a convicted defendant, although they did not believe in the death penalty. In *Witherspoon*, the Supreme Court reversed a death sentence where forty-seven of the potential jurors were excused for cause and dismissed because they voiced that they were opposed to capital punishment or simply because they indicated that they had religious or "conscientious scruples" against its imposition. *Id.* However, *Witherspoon* is inapposite to the *Batson* challenge in this case. Appellant here is challenging the prosecutor's reasons for the peremptory strikes, not challenging the jurors that the judge struck

*for cause.* While it is apparent that jurors should not be excused for cause without further questioning simply because they show hesitation toward the death penalty, counsel has a number of peremptory strikes to be used if it appears certain jurors would be less likely to impose the death penalty. The State may not have been able to strike those jurors for cause based upon the reasons it gave for the peremptory strikes, however those reasons provided race-neutral explanations for those jurors being peremptorily struck.

■ We note that appellant admitted to having also struck several potential African-American jurors that the State had chosen not to strike. Moreover, three African Americans were already seated on the jury at the time the *Batson* challenge was made. As this court has previously noted, "[t]hat, in itself, can answer the charge of purposeful discrimination." *Owens v. State*, 363 Ark. at 418, 214 S.W.3d at 853 (citing *Ratliff v. State*, 359 Ark. 479, 199 S.W.3d 79 (2004)), stating that the best answer the State can have to a charge of discrimination is to point to a jury which has African-American members). While we do not find the trial court was in error by declining to find purposeful discrimination by the State, that is not the end of our analysis.

■■ As discussed, the third step of the *Batson* analysis requires the circuit judge to determine whether the strike's opponent has proven purposeful discrimination. Appellant suggests that he was not given the opportunity to respond to the State in order to persuade the court that the State was not genuine but, rather, had a discriminatory intent. However, a review of the record shows that the court did not prevent appellant from responding to the State's explanations for its strikes. Furthermore, this issue was not preserved for appeal as appellant did not present the argument to the circuit court. *See id.* This court has noted the following in regard to the third stage of a *Batson* analysis:

> [I]t is the responsibility of the party opposing the strike to move the matter forward at the third stage of the process and to meet the burden of persuasion. This is not the trial court's responsibility, as the trial court can only inquire into the evidence that is made available to it. According to this court, if the party opposing the strike does not present more evidence, no additional inquiry by the trial court is required.

*Owens*, 363 Ark. at 417, 214 S.W.3d at 852 (internal citations omitted). If appellant had chosen not to present any additional

argument that the State's reason for striking the jurors was pretextual, the court would not have erred in making a decision based on what had already been presented. However, as illustrated above, appellant did avail himself of the opportunity to respond to the reasons proffered by the State for striking potential jurors Jones, Kincaid, Talley, and Dillard. Therefore, we hold that the court's refusal to find a *Batson* violation was not clearly against the preponderance of the evidence.

For his final point on appeal, appellant contends that, because he was determined by two mental evaluations to have an intelligence quotient (IQ) of 53, his fitness to stand trial should have been determined by the court. The State responds by arguing that his competency to stand trial was not the issue, as appellant only raised the issue of mental retardation in connection with whether, if convicted, he should be sentenced to death. Two mental evaluations received by the court concluded that appellant was fit to stand trial and was not impaired by mental defect. The findings in those evaluations were not contested by either party, therefore the court was not obligated to hold a hearing on the issue of competency to stand trial. Ark. Code Ann. § 5-2-309(b) (Repl. 1997). Later, appellant did file a motion requesting the court to conduct a hearing, however the motion only asked that the State be precluded from seeking the death penalty because the December 7, 2004 report found appellant's IQ to be 53. The motion was based on Ark. Code Ann. § 5-4-618 (Repl. 1997), which states that "there is a rebuttable presumption of mental retardation when a defendant has an intelligence quotient of sixty-five (65) or below," and, that "no defendant with mental retardation at the time of committing capital murder shall be sentenced to death." Ark. Code Ann. § 5-4-618(a)(2) and (b). However, based on the records and the two mental evaluations, including the evidence suggesting that appellant was malingering, the trial court could not conclude that he was mentally retarded, which would have required the court to "death qualify" the jury. Ark. Code Ann. § 5-4-618(d)(2)(B). Because the court found the evidence to be inconsistent, it was a fact question for the jury to decide in the sentencing phase of the trial pursuant to Ark. Code Ann. § 5-4-618(d)(2)(A).

■ ■ First, because appellant did not raise the issue of competency to stand trial below, it is not preserved for this appeal. *Green v. State*, 365 Ark. 478, 231 S.W.3d 638 (2006) (holding that an argument not made to the circuit court cannot be raised on appeal); *Mask v. State*, 314 Ark. 25, 869 S.W.2d 1 (1993) (holding

that a criminal defendant is presumed competent to stand trial unless he proves otherwise). In addition, there is no error in the circuit court permitting the jury to determine whether mental retardation is a mitigating factor that should prevent appellant from being sentenced to death. *Camargo v. State*, 337 Ark. 105, 987 S.W.2d 680 (1999). Accordingly, we affirm the circuit court on this point.

### 4-3(h) Review

In compliance with Ark. Sup. Ct. R. 4-3(h), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to appellant, and no prejudicial error has been found.

Affirmed.