375 Ark. 321

**Stanley D. JACKSON, Appellant,**

v.

**STATE of Arkansas, Appellee.**

**No. CR 07–1016.**

Supreme Court of Arkansas.

Jan. 8, 2009.

Rehearing Denied Feb. 12, 2009.

Janice W. Vaughn, Arkansas Public Defender Comm'n, for appellant.

Dustin McDaniel, Att'y Gen., by: Vada Berger, Ass't Att'y Gen., for appellee.

ELANA CUNNINGHAM WILLS, Justice.

At approximately 1:45 a.m. on January 22, 2005, Dumas Police Department Inves-

tigator Chuck Blevins received a call reporting a shooting at Debbie Dean's, a restaurant in Dumas. Upon arriving at Debbie Dean's, Blevins found the body of Herman Cobb, Jr., on the floor with a gunshot wound to the head. After the coroner arrived, Blevins also discovered that Cobb had also been shot in the thigh. There were indications that a fight had taken place in the restaurant, as well.

Later in the day on January 22, 2005, appellant Stanley Jackson and his brother, Damon Freeman (who was also known as Damon Jackson), turned themselves in to the police. After both men gave statements to the police, Jackson was arrested and charged with capital murder.[1] In March of 2007, Jackson was tried and convicted of capital murder, and a Desha County jury sentenced him to life imprisonment. Jackson filed a timely notice of appeal, and now raises six points for reversal. We find no error and affirm.

### I. Sufficiency of the Evidence

■ In his first argument on appeal, Jackson contends that the trial court erred in denying his motion for directed verdict.[2] We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *See Wertz v. State,* 374 Ark. 256, 287 S.W.3d 528 (2008); *Stephenson v. State,* 373 Ark. 134, 282 S.W.3d 772 (2008). The test for determining the sufficiency of the evidence is whether the verdict is sup-

ported by substantial evidence, direct or circumstantial. *Wertz, supra.* Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Id.* On appeal, we view the evidence in the light most favorable to the State, considering only that evidence that supports the verdict. *Id.*

■ One commits capital murder if, "with the premeditated and deliberated purpose of causing the death of another person, [he] causes the death of any person[.]" Ark.Code Ann. § 5–10–101(a)(4) (Repl.2006 & Supp.2003). This court has said that "[p]remeditated and deliberated murder occurs when it is the killer's conscious object to cause death, and he forms that intention before he acts and as a result of a weighing of the consequences of his course of conduct." *Daniels v. State,* 373 Ark. 536, 285 S.W.3d 205 (2008); *Carmichael v. State,* 340 Ark. 598, 602, 12 S.W.3d 225, 228 (2000). *See also O'Neal v. State,* 356 Ark. 674, 158 S.W.3d 175 (2004) (defining deliberation as "weighing in the mind of the consequences of a course of conduct, as distinguished from acting upon a sudden impulse without the exercise of reasoning powers").

■ This court has also noted that premeditation and deliberation may be formed in an instant. *Winston v. State,* 372 Ark. 19, 269 S.W.3d 809 (2007); *McFarland v.*

---

1. Jackson was also charged with being a felon in possession of a firearm; however, the circuit court subsequently granted Jackson's motion to sever this charge from the capital murder charge.

2. The court notes its strong displeasure with the brief in this case. Prior to the submission of the briefs, Jackson's appellate counsel filed a motion to submit an enlarged brief, seeking permission to file a thirty-six page brief. The court denied the motion, but we did allow counsel to file a thirty-page brief. When the briefs were submitted, counsel's brief was

thirty pages long; however, seven to eight of those thirty pages were single-spaced. Rule 4–1(a) of the Rules of the Arkansas Supreme Court requires briefs to be "double-spaced, except for quoted material, which may be single-spaced and indented." The single-spaced portions of appellant's brief, however, contain no quoted materials. Rather, they consist primarily of summaries of various witnesses' testimony and potential jurors' comments during voir dire. We refer this matter to the Supreme Court Committee on Professional Conduct.

*State*, 337 Ark. 386, 989 S.W.2d 899 (1999). Moreover, while intent can rarely be proven by direct evidence, a jury can infer premeditation and deliberation from circumstantial evidence, such as the type and character of the weapon used; the nature, extent, and location of wounds inflicted; and the conduct of the accused. *Fudge v. State*, 341 Ark. 759, 20 S.W.3d 315 (2000).

The facts introduced at trial indicated that Cobb and Jackson's brother, Damon Freeman,[3] were embroiled in a fight in the early morning hours of January 22, 2005. The State's first witness, Nick Ward, testified that he and Cobb had been riding around that night and decided to stop and get something to eat at Debbie Dean's. About five or ten minutes after they ordered their food, Jackson and Freeman came in; Jackson left, but Freeman ordered something to eat. Freeman and Cobb began to argue about something and started fighting. Jackson came back in the restaurant and asked who was trying to fight his brother. At the same time, Ward said, Jackson pulled a gun out of his pants. As Jackson began to fire the weapon, Ward "bumped" him, and Jackson shot out a light fixture.

Ward testified that Jackson fired the gun again, hitting Cobb in the leg. Ward further testified that Cobb stated, "You shot me, cuz." At some point after this shot, Jackson dropped the gun, but Ward testified that Jackson must have picked it back up again because he was the next person whom Ward observed with the gun. Freeman and Cobb continued wrestling, and Freeman slammed Cobb to the ground. Ward and Freeman both asked Jackson not to shoot Cobb. However, despite their pleas, Ward said that Jackson "just shot" and Cobb "just laid back down, fell back down." Ward stated that per- haps a minute or two elapsed between the second and third shots. He also asserted that Cobb never reached for the gun and that he was watching the altercation the entire time. On redirect examination, Ward identified Jackson as the man who shot Cobb.

Lee Jones testified that he was also present at Debbie Dean's that night. Jones said that he was placing an order for some food alongside Freeman when Freeman and Cobb began arguing. Freeman stepped back from the counter, hit Cobb in the face, and started fighting with him. Jones was attempting to break up the fight when Jackson came in and drew his gun. Jones saw Jackson aim the gun at Cobb and fire, and then Jones ran behind the counter where he heard another shot. After the shooting ended, Jones stood up and saw Jackson and Freeman standing in front of the door, and he saw Cobb "laid out in the floor." On cross-examination, Jones stated that the only person he saw in the restaurant that night with a gun was Jackson.

Other witnesses described a similar scene. Latoya Thomas testified that Freeman and Cobb were fighting, and then shots were fired. She said that the first shot took out the light; the second shot hit Cobb in the leg; and "the third shot I was out of Debbie Dean's." Thomas verified that Jackson was the one who shot Cobb in the leg, and she did not see anyone else with a gun. She also stated that she heard Ward begging Jackson not to shoot Cobb again.

Anthony Harrell, who also observed the fight between Freeman and Cobb, saw Jackson enter the restaurant with a gun and begin shooting at Cobb. After the first two shots, Harrell ducked behind the

---

**3.** Damon Freeman is also known as Damon Jackson, but for clarity's sake, we refer to him as "Freeman."

counter. While behind the counter, Harrell heard Cobb mumble, "Please don't shoot me" or "Please don't kill me." Shortly after that, Harrell heard the third shot.

Debbie Dean, the owner of the restaurant, testified that Cobb came in the restaurant that night and ordered some food. Some time later, Freeman came in, and the two men began fighting. She said that some customers tried to break up the fight, and Harrell, her fiancé, hollered at her to call the police. During the fight, she saw Jackson enter the restaurant, pull out a gun, and shoot up at the ceiling. After he shot out the light, she got down on the floor in the kitchen. She did not see anyone else with a gun that evening. Dean did say, however, that she heard Cobb mumble Freeman's name.

Kevin Knight, a police officer with the Dumas Police Department, testified that he interviewed Jackson as part of the investigation of the shooting.[4] After Jackson was read his *Miranda* rights, he gave a statement to Knight on January 23, 2005, in which he said that he was standing outside of Debbie Dean's when he heard someone say there was a fight inside. Upon entering the building, he saw his brother on the floor. Jackson said that Cobb pulled a gun, and Jackson and Cobb "tussled" over the gun. The first shot took out the lights, and after the second shot, Jackson said, he left the building.

In his statement, Jackson contended that he had "no intentions on anybody dying," and he was "just defending [himself] to keep [Cobb] from shooting [him]." Jackson then told Knight that the gun should still be on the floor of the restaurant if no one picked it up. Jackson denied that Freeman ever had the gun. When Knight asked why he turned himself in, Jackson replied that he felt like it would only get worse if he ran.

Jackson gave a second statement to Knight on January 24, 2005. In this statement, Jackson admitted that he killed Cobb, but he claimed it was not intentional and that the gun had only gone off as they were "tussling" over it. In this statement, Jackson said that he "snatched" the gun from Cobb as Cobb was falling to the ground, and that he ran outside and threw the gun in a ditch.

Dr. Frank Peretti, the Associate Medical Examiner at the Arkansas State Crime Lab, testified that Cobb suffered from two bullet wounds: the first appeared to have been fired from some distance away and traveled through his thigh without hitting any major blood vessels; the second entered Cobb's head above his left ear, traveled downward through the brain, and lodged in the bone of the skull. Dr. Peretti opined that, given the location and trajectory of the gunshot wound, it would not have been possible for the injury to have occurred if Cobb had been "tussling" over the gun by pulling or pushing it back and forth in front of him at chest level.

On appeal, Jackson argues that the above evidence "does no more than prove that when [he] entered Debbie Dean's and saw his brother and [Cobb] fighting, he pulled a gun and shot out the lights." He concedes that the evidence demonstrates that he shot Cobb in the leg, but he argues that there was no evidence showing that he possessed the premeditation and deliberation necessary to support a capital murder conviction.

However, it is clear that the State presented sufficient evidence to defeat Jackson's directed-verdict motion. No witness testified that they saw anyone other than Jackson with the gun, and Nick Ward

---

4. Jackson initially declined to give a statement in the hours following his arrest.

testified that Jackson fired three shots. All witnesses agreed that the first shot took out a light fixture, and Cobb suffered two gunshot wounds: one to the thigh and one to the head. Moreover, in his statement, Jackson himself admitted that he killed Cobb. The fact that over a minute elapsed between the shot to Cobb's thigh and the shot to his head was sufficient to show premeditation and deliberation. *See, e.g., Daniels v. State,* 373 Ark. 536, 285 S.W.3d 205 (2008) (finding evidence of premeditation and deliberation where security videotape showed that the defendant paused before delivering the fatal stabbing blow). Accordingly, we conclude that the circuit court did not err in denying Jackson's motion for directed verdict.

## II. Voir Dire Issues

In his second point on appeal, Jackson raises numerous challenges to the manner in which voir dire was conducted. He contends that the trial court erred in 1) failing to continue the case when a number of people who had been summoned for jury duty did not show up; 2) proceeding with jury orientation when Jackson was not present; 3) excusing certain jurors who had expressed reservations about the death penalty, allowing the State to ask the venire members "impermissible questions designed to commit them to a verdict," and allowing the State to death-qualify the jury; and 4) denying Jackson's *Batson* challenges.

■ The extent and scope of voir dire is left to the sound discretion of the trial court, and the trial court's ruling will not be disturbed on appeal absent an abuse of discretion. *See Price v. State,* 365 Ark. 25, 223 S.W.3d 817 (2006); *Williams v. State,* 363 Ark. 395, 214 S.W.3d 829 (2005). The judge's restriction of that examination will not be reversed on appeal unless that discretion is clearly abused. *Price, supra.* Abuse of discretion occurs when the circuit

judge acts arbitrarily or groundlessly. *Id.; Isom v. State,* 356 Ark. 156, 171–72, 148 S.W.3d 257, 267–68 (2004).

■ In his first subpoint, Jackson argues that the circuit court erred when it failed to continue the trial after a number of the venire members who had been summoned for jury duty failed to appear. Jackson's trial was scheduled to begin in Desha County Circuit Court on the morning of Monday, February 26, 2007. However, on Saturday, February 24, 2007, a tornado struck the city of Dumas. On Monday morning, the circuit court assembled the attorneys in chambers prior to the beginning of the proceedings. At that time, Jackson had not arrived at the courthouse yet, although the court's clerk advised that the sheriff's office had said they were "on their way from Dumas with him right now." In addition, one of Jackson's attorneys, Llewellyn Marczuk, had not yet arrived at the courthouse because he had been involved in an auto accident on his way to court.

The judge commented that, despite the devastation in Dumas, he thought they could "select a jury from all of the other surrounding areas. But we'll just see who all shows up." The judge and counsel then discussed which attorneys would be handling which phases of the proceedings, how many witnesses each side would call, whether an offer had been made, and other preliminary matters. The court also informed the attorneys that it intended to excuse any jurors who had been directly affected by the storm.

The parties proceeded into open court, where the judge assembled those jurors who had shown up and played a videotaped juror orientation. After the video was over, the court began asking questions to determine whether everyone was eligible to serve on a jury, such as whether everyone was over the age of eighteen, a citizen

of the United States, and lived in Desha County, and whether anyone was a convicted felon or had served on a jury within the last two years. Two jurors were excused at this time.[5]

After another short period of discussion between the court and counsel, Bing Colvin, one of Jackson's attorneys, commented that the proceedings had been going on without Jackson's presence. Colvin moved for a mistrial, arguing the jury would infer, from Jackson's absence, that he was disinterested in the proceedings. The court denied the mistrial, noting that the roll had not been called and no jurors had been sworn in, but agreed to suspend the proceedings until Jackson arrived.

Jackson arrived at the courthouse shortly thereafter, and the court administered the oath to the prospective jurors. The State announced that it was ready for trial, but Jackson's attorneys asked the court for a continuance based on the fact that the defense team had not yet completed its mitigation investigation. The court denied the motion and proceeded to call the roll of the prospective jurors. Many of the names that were called received no response; Jackson alleges that, of the 108 people who had been summoned, twenty-eight failed to appear.

On appeal, Jackson argues that the trial court's failure to continue the trial resulted in a violation of his fundamental right to a fair trial before an impartial jury made up of a cross-section of the community. However, as is apparent from the sequence of events set out above, Jackson never raised a fair-cross-section objection before the trial court. The essence of a "fair-cross-section" claim is the systematic exclusion of a "distinctive group" in the community. *See Harris v. State,* 320 Ark. 677, 682, 899 S.W.2d 459, 462 (1995) (citing *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986)). However, an objection on this basis must be raised in a timely fashion. In *Harris, supra,* the defendant did not raise his fair-cross-section argument until after trial in his motion for new trial; this court held that his objection was untimely. *Id.* at 682–83, 899 S.W.2d at 462. Here, the argument was never raised at all. Therefore, we decline to address it.[6]

■ Jackson's second subpoint concerns the court's decision to conduct jury orientation before he was brought to the courthouse. As noted above, Jackson's counsel moved for a mistrial based on Jackson's absence, but the trial court denied it. On appeal, Jackson asserts that a criminal defendant has the right to be present during the process of impaneling a jury, and that, by "moving forward with jury selection in [his] absence," the circuit court violated his constitutional right to a fair trial before an impartial jury made up of a cross-section of the community, as well as his confrontation and due-process rights.

■ The State responds that Jackson's argument is not preserved, as he failed to move for a mistrial at the earliest opportu-

---

5. One woman had brought her child to court with her because she could not arrange for daycare, and one man was excused because he had sat on a jury within the last two years.

6. Jackson asserts that the circuit court should have intervened on its own accord to address this matter, citing *Wicks v. State,* 270 Ark. 781, 606 S.W.2d 366 (1980). However, this court has noted that, if we have previously rejected an attempt to argue an error on appeal when no objection was made, or no contemporaneous objection was raised, the alleged error cannot be within the *Wicks* categories. *See Buckley v. State,* 349 Ark. 53, 76 S.W.3d 825 (2002). Therefore, as the *Harris* court held that a fair-cross-section challenge requires a timely objection, the argument cannot fall under the *Wicks* categories of arguments that may be raised for the first time on appeal.

nity. We note that, at the time he made his motion, the court had already engaged in discussions with counsel and had played the orientation videotape for the jury. Clearly, Jackson had been absent throughout these proceedings, but the mistrial motion was not raised until well after these events occurred. A motion for mistrial must be raised at the first opportunity. *See Ellis v. State,* 366 Ark. 46, 233 S.W.3d 606 (2006); *Dorn v. State,* 360 Ark. 1, 199 S.W.3d 647 (2004). This is true even when the alleged error involves trial proceedings occurring in the defendant's absence. *See Clayton v. State,* 321 Ark. 602, 608, 906 S.W.2d 290, 294 (1995). Here, had Jackson moved for mistrial at the first opportunity—perhaps, say, as soon as the trial court initiated its discussion with counsel in chambers—the court could have halted the proceedings until Jackson arrived at the courthouse and avoided any potential problems.

■ In his third subpoint, Jackson argues that the circuit court "erred by excusing for cause potential jurors who expressed reservations about imposing the death penalty; by failing to excuse those jurors who were unfit for jury duty; and by allowing the State to ask the venire persons impermissible questions designed to commit them to a verdict, and to use the answers to exclude from the jury anyone who had qualms about the death penalty."

Jackson alleges that the court erred by allowing the prosecutor to ask potential jurors a set of "A or B" questions regarding their views on the death penalty. The questions were these:

A. I believe the death penalty is appropriate in some capital cases, and I could return a verdict resulting in death in a proper case; or

B. Although I don't believe that the death penalty should be imposed, as long as the law provides for it, I could

assess the death penalty in the proper set of circumstances.

The State struck any potential juror who answered "B" to this question. Jackson also argues that the State should not have been permitted to read the potential jurors the aggravating circumstances on which it was relying and ask those jurors whether they agreed that such a factor ought to be considered an aggravator. In essence, Jackson argues that this practice allowed the State to commit the jurors to a verdict and select only those who were prone to imposing the death penalty.

To the extent that Jackson objects to the "death-qualification" of his jury, his argument is moot because he was sentenced to life imprisonment. This court has held that, where a defendant receives a sentence of life in prison, he lacks standing to raise errors having to do with the death penalty. *See Hamilton v. State,* 348 Ark. 532, 537, 74 S.W.3d 615, 618 (2002); *King v. State,* 312 Ark. 89, 92, 847 S.W.2d 37, 39 (1993) (the fact that the jury was death-qualified and death was considered throughout the trial as a possible sentence is of no moment when death is not the penalty assessed). Therefore, we do not address Jackson's arguments wherein he urges that the trial court erred in 1) refusing to grant Jackson's cause challenges to jurors who stated that they would be unable to consider anything but the death penalty and 2) granting the State's cause challenges to jurors with reservations about the death penalty.

■ Nonetheless, Jackson argues that the "death-qualification" process left him with a jury that was unwilling to consider mitigation evidence. Specifically, he points to Juror Abernathy, who stated that he did not believe in lesser degrees of murder, and contends that the trial court erred in refusing to strike Abernathy for cause. However, Jackson did not preserve

his for-cause argument with respect to Abernathy.

Abernathy was one of a panel of six venire members; the other people were Mr. Hundley, Ms. O'Leary, Mr. Mays, Ms. Fletcher, and Mr. Regan. Jackson argues that Abernathy stated during voir dire that "I think if you murder somebody, ... you've done it and that's it. There shouldn't be a lesser. If you murdered somebody you murdered somebody." Jackson initially moved to strike Abernathy for cause, but the court decided to allow the parties to attempt to rehabilitate him. When the State and the defense reached the end of their voir dire, the court asked again if there were any cause challenges. Jackson's attorneys immediately moved to strike Mr. Hundley, who was the deputy prosecutor's brother-in-law; this strike was granted in the following colloquy:

THE COURT: I'll grant that one. Of course, I haven't heard arguments, but I'll grant that one.

MR. PORCH: Note my exception.

THE COURT: Very well, I'll note your exception.

THE CLERK: So Abernathy is cause?

THE COURT: No. Larry Hundley. Implied bias. Are there any others?

Jackson's counsel responded by naming Fletcher, O'Leary, and Mays. No other mention was made of Abernathy. Therefore, Jackson either failed to receive a ruling on his initial motion to strike Abernathy for cause, or he withdrew his for-cause challenge. Thus, he has failed to preserve his argument on appeal in regard to Abernathy. *See Flowers v. State*, 342 Ark. 45, 25 S.W.3d 422 (2000).

Next, Jackson urges more generally that the State's deliberate selection of death-prone jurors prohibited the jury from being able to consider any evidence of mitigation. In essence, he contends that the death-qualification of the jury prejudiced him by causing him to be tried by a jury prone to conviction, stating that the jury's "unwillingness to consider [his mitigation] evidence manifested itself in a verdict of guilty of capital murder, rather than one of the lesser degrees of murder advanced" at trial. However, the United States Supreme Court has rejected this argument, *see Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) (dismissing the notion that death-qualifying a jury results in a jury that is more prone to convict a capital defendant), as has this court. *See Hickson v. State*, 312 Ark. 171, 847 S.W.2d 691 (1993); *Ruiz v. State*, 299 Ark. 144, 772 S.W.2d 297 (1989).

Finally, Jackson argues that the trial court should have granted his motion to strike an entire six-member panel from the venire after the defense team received word from some of Jackson's family members that they had overheard Jason Curtis, one of the venire persons, making comments to the effect of, "If he's a Jackson, he's guilty." Jackson urges that this entire panel was tainted and should have been stricken for cause, which would have saved him from having to use four of his twelve peremptory strikes on this panel.

We do not address Jackson's argument because "it pertains to venire persons that appellant excused through the use of his peremptory challenges." *Willis v. State*, 334 Ark. 412, 420, 977 S.W.2d 890, 894 (1998). It is well settled that the loss of peremptory challenges cannot be reviewed on appeal. *Id.; see also Ferrell v. State*, 325 Ark. 455, 929 S.W.2d 697 (1996). The focus should not be on a venire person who was peremptorily challenged, but on the persons who actually sat on the jury. *Willis*, 334 Ark. at 420, 977 S.W.2d at 894. Of these six venire persons, the court struck Curtis for cause; the State exercised a peremptory challenge as to another; and the defense exercised peremptory

challenges to the remaining four. Because Jackson excused these four out of the six venire persons through peremptory challenges, we do not address Jackson's allegations of error as to them. *See Willis,* 334 Ark. at 420, 977 S.W.2d at 894.

■ In his fourth and final subpoint pertaining to alleged errors during voir dire, Jackson argues that the circuit court erred in denying his *Batson* challenges to the State's striking of several jurors. Under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), a prosecutor in a criminal case may not use his peremptory strikes to exclude jurors solely on the basis of race. *Travis v. State,* 371 Ark. 621, 269 S.W.3d 341 (2007); *Ratliff v. State,* 359 Ark. 479, 199 S.W.3d 79 (2004). In determining whether such a violation has occurred, a three-step analysis is applied. The first step requires the opponent of the peremptory strike to present facts that show a prima facie case of purposeful discrimination. *Stokes v. State,* 359 Ark. 94, 194 S.W.3d 762 (2004). This first step is accomplished by showing the following: (a) the opponent of the strike shows he is a member of an identifiable racial group; (b) the strike is part of a jury-selection process or pattern designed to discriminate; and (c) the strike was used to exclude jurors because of their race. *Id.* (citing *MacKintrush v. State,* 334 Ark. 390, 978 S.W.2d 293 (1998)).

Once a prima facie case of discrimination has been shown, the process moves to the second step, wherein the burden of producing a racially neutral explanation shifts to the proponent of the strike. `*Travis,*

*supra.* This explanation, according to *Batson,* must be more than a mere denial of discrimination or an assertion that a shared race would render the challenged juror partial to the one opposing the challenge. *Weston v. State,* 366 Ark. 265, 234 S.W.3d 848 (2006). The reason will be deemed race neutral "[u]nless a discriminatory intent is inherent in the prosecutor's explanation." *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). But, according to *Purkett,* a trial court must not end the *Batson* inquiry at this stage, and, indeed, it is error to do so. If a race-neutral explanation is given, the inquiry proceeds to the third step, in which the trial court must decide whether the opponent of the strike has proven purposeful discrimination. *Travis, supra.* We will not reverse a trial court's findings on a *Batson* objection unless the trial court' decision was clearly against the preponderance of the evidence. *Ratliff, supra.*

Jackson argues his jury was disproportionately deprived of African–American members due to the State's exercise of peremptory strikes.[7] The first of Jackson's *Batson* challenges was in regard to prospective juror Charles Carr. After the State moved to strike Carr, Jackson objected and pointed out that the State had been asking potential jurors if they had children close to Jackson's age, but had only been asking that question of black jurors. The State responded that it had not established a pattern of racially motivated strikes, noting that of the five per-

---

7. Jackson also argues that the State's use of peremptory challenges against African–Americans violated his rights to a jury comprised of a fair cross section of the community. However, the United States Supreme Court has held that the fair-cross-section requirement does not preclude the State from using peremptory challenges on the basis of race. *See Lockhart v. McCree,* 476 U.S. 162, 173, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) ("We have never invoked the fair-cross-section principle to invalidate the use of . . . peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large."); *see also Holland v. Illinois,* 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990).

emptory challenges it had exercised to that point, four of them were white venire members. The State then offered, as a racially neutral reason, that it had excused Carr because he had answered "B" to the State's "A or B" question about his views on the death penalty. The court accepted this as a racially neutral reason.

The other three venire members about whom *Batson* challenges were raised were Jessie Powell, Percy Bentley, and Lorene Lewis. In each case, after Jackson raised his *Batson* challenge, the State explained that the potential jurors had answered "B" to his question on their views about the death penalty. In addition, as to Lorene Lewis, the State explained that Lewis had said that she went to church with Jackson's wife and had visited with her at the courthouse.

On appeal, Jackson argues that the circuit court should have conducted a "reasonable and sensitive inquiry into the race-neutral reasons stated by the prosecutor." However, the record reflects that Jackson did not pursue any further questioning after the State offered its racially neutral explanations to the circuit court. In *Weston v. State*, 366 Ark. 265, 234 S.W.3d 848 (2006), this court noted that it is the responsibility of the party opposing the strike to move the matter forward at the third stage of the process and to meet the burden of persuasion. *Weston*, 366 Ark. at 275, 234 S.W.3d at 856. The *Weston* court further stated that "[t]his is not the trial court's responsibility, as the trial court can only inquire into the evidence that is made available to it. According to this court, if the party opposing the strike does not present more evidence, no additional inquiry by the trial court is required." *Id.*

Moreover, in *Weston, supra*, this court upheld the State's use of the same "A or B" questions as were utilized in this case. The *Weston* court noted that, while jurors should not be excused for cause without

further questioning simply because they expressed reservations about the death penalty, the State could use its peremptory strikes to excuse jurors if it appeared they "would be less likely to impose the death penalty." *Weston*, 366 Ark. at 275, 234 S.W.3d at 856. Accordingly, there is no merit to Jackson's argument that the State's reason for striking these jurors (i.e., they had all answered "B") was not a valid reason for eliminating potential jurors. This is especially so when, as here, the State struck *every* juror—not just the African–American ones—who answered "B" to its question about their views on the death penalty. Accordingly, we conclude that there is no merit to Jackson's *Batson* claim.

### III. Ineffective Assistance of Counsel

■ In his third point on appeal, Jackson argues that the circuit court should have granted his motion for mistrial, made during voir dire, in response to the alleged ineffectiveness of one of his four attorneys. As attorney Marczuk was conducting voir dire of the fourth group of potential jurors, he raised an objection to a line of the State's questioning. After the court excused the venire members so that counsel could discuss Marczuk's objection, Marczuk asked that the panel be stricken, but the prosecutor, Thomas Deen, commented that it had been raising the same line of questions with the previous jurors. Marczuk replied that one of the other three attorneys had been objecting unsuccessfully to the question, and he did "not mind doing it again." Deen retorted, "That's probably because you were sleeping during the other ones."

After another defense attorney complained that Deen's comment was derogatory, Deen replied that Marczuk "has obviously been sleeping during these proceedings." The court then attempted to

turn the discussion to the actual objection that had been raised, and the court ultimately denied defense counsel's request that the panel be stricken. At that point, defense attorney Bing Colvin again raised Deen's comment about Marczuk's sleeping, and the following colloquy occurred:

COLVIN: Well, I've tried a number of cases against this prosecution, and one of their tactics is to make snide remarks like that. And it's got no place in a trial where a man's life is at stake. And it's only done to make us look bad. Now, it's just not—

COURT: What is the objection—

COLVIN:—got any place in the record. It's not got any place in front of the jury.

DEEN: Look bad to who? There's nobody but us in here.

COLVIN: And that's what I meant. He's going to keep going. I want to make a record. I made an objection when we first got started when we were going through that death is different.

COURT: Well, let me—I understand. I think maybe it's my responsibility. And lead counsel for the defense obviously has delegated the responsibility to somebody else. But he's alert and he's ready to go now. Let's bring the jury back. The jury hasn't—we've been going several hours. But I mean, nobody is making up anything. But, you know, he has a battery of attorneys for the defense—

DEEN: I'm not suggesting he's suffered any prejudice by it. I'm not suggesting that in the slightest.

MARCZUK: Well, apparently he has. So I'll, we'll go ahead and declare me ineffective, Judge. I have no problem with that. If that's what you want to do, I have no problem with that. Maybe we should just start over. I'll

go ahead and ask to recuse. If I might go ahead and ask to step aside.

COURT: Well, I'm ready to go forward.

MARCZUK: Is that denied, Judge?

COURT: Yes. I really think that if you want to be excused, you can. If you're ready to go, that's fine.

MARCZUK: No, I can't deny it, Judge. I stayed up late last night. I've fallen asleep. I'm sure not going to drive now. Sure not going to.

COURT: Now, he has three other competent attorneys. He's not the only counsel for the client. But in terms of your objections, I'm ready to bring in the jurors.

On appeal, Jackson argues that his attorney's behavior prejudiced his ability to receive a fair trial, and the trial court's "refusal to grant a mistrial violated [his] Sixth Amendment right to effective assistance of counsel, as well as a fair and impartial jury." However, it is not apparent from the above colloquy that any of Jackson's attorneys ever specifically moved for a mistrial. In addition, the colloquy does not reflect that any of Jackson's attorneys ever argued that Jackson's right to a fair and impartial jury had been violated. Accordingly, neither of these arguments is preserved for appeal. *See Dorn v. State*, 360 Ark. at 4, 199 S.W.3d at 649 (a motion for mistrial, like an objection, must be both contemporaneous and specific).

Thus, the court need only consider whether Marczuk's actions rendered his assistance ineffective. Under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to determine ineffective assistance of counsel, the petitioner must show first that counsel's performance was deficient. *Sparkman v. State*, 373 Ark. 45, 281 S.W.3d 277 (2008). Second,

the petitioner must show that the deficient performance prejudiced the defense, which requires showing that counsel's errors were so serious as to deprive the petitioner of a fair trial. *Id.* The petitioner must show there is a reasonable probability that, but for counsel's errors, the fact-finder would have had a reasonable doubt respecting guilt, *i.e.*, the decision reached would have been different absent the errors. *Id.* Furthermore, unless a petitioner makes both *Strickland* showings, it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable. *Id.* Actual ineffectiveness claims alleging deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice. *Id.*

Jackson cites cases in support of the premise that "sleeping counsel is tantamount to no counsel at all." *See, e.g., United States v. Thomas,* 194 Fed. App'x 807 (11th Cir.2006); *Burdine v. Johnson,* 262 F.3d 336 (2001). Cases such as *Burdine, supra,* and *Tippins v. Walker,* 77 F.3d 682 (2d Cir.1996), have held that prejudice can be presumed from the fact of a defense attorney's sleeping through critical stages of a defendant's trial because "if counsel sleeps, the ordinary analytical tools for identifying prejudice are unavailable." *Tippins,* 77 F.3d at 686. *See also United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (a defendant is denied counsel not only when his attorney is physically absent from the proceeding, but when he is mentally absent as well, whether by being asleep, unconscious, or otherwise *non compos mentis* ).

However, the cases on which Jackson relies involve a sole defense attorney sleeping through large portions of the trial. *See, e.g., Burdine,* 262 F.3d at 339 (witnesses testified that attorney fell asleep as many as ten times during trial, once for at least ten minutes). Here, on the other hand, Jackson had four attorneys, all of whom participated in voir dire. Moreover, the record does not reflect how long Marczuk had been asleep, and even during those periods when he was sleeping, Jackson's other attorneys were actively engaged in voir dire. In *Ex Parte McFarland,* 163 S.W.3d 743 (Tex.Crim. App.2005), the Texas Court of Criminal Appeals refused to presume prejudice from lead counsel's naps, even when they occurred during critical stages of the trial, because the defendant had two attorneys and was thus never without counsel. *McFarland,* 163 S.W.3d at 752–53. Accordingly, because Jackson was never without the assistance of counsel—and counsel about whom he raises no claims of ineffectiveness—his argument lacks merit.

### IV. Exclusion of Testimony

In his fourth point on appeal, Jackson takes issue with two of the circuit court's evidentiary rulings: the first ruling admonished the jury not to draw an inference from one witness's testimony that Damon Freeman was the one who shot Herman Cobb; the second ruling precluded Jackson from calling two witnesses who would have testified about the relationship between Jackson and his brother. The circuit court has wide discretion in making evidentiary rulings, and we will not reverse its ruling on the admissibility of evidence absent an abuse of discretion. *See Wright v. State,* 368 Ark. 629, 249 S.W.3d 133 (2007); *Brunson v. State,* 368 Ark. 313, 245 S.W.3d 132 (2006).

During Jackson's cross-examination of witness Anthony Harrell, Jackson engaged in a reenactment of the scene with Harrell in an attempt to demonstrate to the jury where Jackson, Freeman, and Cobb were located at the time Cobb was shot. Counsel then asked Harrell, "isn't it true that . . . [Freeman] is right-handed, and Herman Cobb is shot in the left side of the head, so it has to come from this angle of

[Freeman], not [Jackson]? Isn't that correct? He was shot in the left side of the head?" Counsel then reiterated, "That's the side he gets shot in, the side [Freeman] is on. Right?" The State objected, arguing that there was no evidence that Freeman had shot Cobb and asking the court to strike the question from the record. The court agreed, admonishing the jury as follows:

> Ladies and gentlemen, I want to give you a cautionary instruction just for precautionary measures. There has not been any evidence presented at this time that supports that Herman Cobb was shot by [Freeman], and no inference is to be drawn that he was. And, if so, you are to disregard any inference that Herman Cobb was shot by [Freeman].

Jackson did not object to the admonition at the time. However, during the testimony of the next witness, Debbie Dean, Jackson asked the court to withdraw the admonition when Dean testified that she heard Cobb mumble Freeman's name. The court denied the request, explaining that the admonition had gone to "that particular statement."

On appeal, Jackson argues that the trial court erred by "directing the jurors to disregard evidence that Freeman may have killed Cobb." However, as the State notes, at the time the court admonished the jury, there simply was no evidence that Freeman had been the one who shot Cobb. All of the witnesses' testimony indicated that Jackson had been the only one seen with the gun, and Nick Ward testified that Jackson fired the third shot at Cobb. Therefore, the inference counsel wished to draw from his questioning was drawn from facts that were not in evidence. *See Perry v. State*, 279 Ark. 213, 216, 650 S.W.2d 240, 243 (1983) (questions which assume facts not in evidence are improper). Accordingly, the circuit court did not err in admonishing the jury.

Next, Jackson contends that the circuit court abused its discretion when it refused to allow him to call two of his sisters to testify during the guilt phase of his trial. These sisters, whose testimony Jackson was permitted to proffer, would have described the relationship between Jackson and Freeman in order to show that, by seeing his brother being beaten up by Cobb, Jackson was somehow provoked into shooting Cobb. This, Jackson contends, went to the heart of his defense that the shooting was an act of manslaughter, rather than an act of capital murder. After listening to the proffered testimony, however, the trial court ruled that it did not see how their testimony "would be relevant on guilt or innocence."

On appeal, Jackson urges that the circuit court's ruling prevented him from "present[ing] evidence to refute the elements of capital murder" in violation of his Fifth and Sixth Amendment rights to present a defense. He contends that he wished to call his sisters to "show the reasonableness of the provocation that led to this incident, as well as to explain [his] emotional state at the time." However, even assuming that the sisters' testimony demonstrated the close nature of Jackson's relationship with his brother, the court's decision to exclude the testimony did not rise to the level of reversible error. This is so because, regardless of that testimony, the evidence still overwhelmingly showed that Jackson was not entitled to a manslaughter instruction, as discussed below. As such, the circuit court did not abuse its discretion in ruling that the sisters' testimony was irrelevant to the guilt phase of Jackson's trial.

### V. Jury Instructions on Manslaughter as a Lesser–Included Offense

As mentioned above, Jackson was charged with capital murder. While the

parties were preparing their jury instructions, Jackson asked the court to instruct the jury on the lesser-included offense of manslaughter. The court denied the request, finding that the facts did not support the instruction. Jackson then proffered the instruction to the court. On appeal, Jackson argues that the circuit court's rejection of his proffered jury instruction was error.

■■■■ This court has stated repeatedly that it is reversible error to refuse to instruct on a lesser-included offense when there is the slightest evidence to support the instruction. *See Boyle v. State,* 363 Ark. 356, 361, 214 S.W.3d 250, 252–53 (2005) (citing *Flowers v. State,* 362 Ark. 193, 208 S.W.3d 113 (2005)). However, we will affirm a trial court's decision not to give an instruction on a lesser-included offense if there is no rational basis for giving the instruction. *Id.* at 362, 214 S.W.3d at 253. Finally, we will not reverse a trial court's ruling regarding the submission of such an instruction absent an abuse of discretion. *Id.* (citing *Grillot v. State,* 353 Ark. 294, 107 S.W.3d 136 (2003)).

The manslaughter instruction that Jackson wished to submit to the jury comes from Ark.Code Ann. § 5–10–104(a)(1) (Repl.1997), which provides as follows:

(a) A person commits manslaughter if: ... [t]he person causes the death of another person under circumstances that would be murder, except that he or she causes the death under the influence of extreme emotional disturbance for which there is reasonable excuse.... The reasonableness of the excuse is determined from the viewpoint of a person in the actor's situation under the circumstances as the actor believed them to be[.]

In order for a jury to be instructed on extreme-emotional-disturbance manslaughter, this court has repeatedly held that there must be evidence that the defendant killed the victim in the moment following some kind of provocation, such as "physical fighting, a threat, or a brandished weapon." *Boyle,* 363 Ark. at 362, 214 S.W.3d at 253 (quoting *Kail v. State,* 341 Ark. 89, 94, 14 S.W.3d 878, 881 (2000)).

■■■■ This court has also stated that the passion that will reduce a homicide from murder to manslaughter

may consist of anger or sudden resentment, or of fear or terror; but the passion springing from any of these causes will not alone reduce the grade of the homicide. There must also be a provocation which induced the passion, and which the law deems adequate to make the passion irresistible. An assault with violence upon another who acts under the influence thereof may be sufficient to arouse such passion.

*MacKool v. State,* 363 Ark. 295, 298–99, 213 S.W.3d 618, 620–21 (2005) (quoting *Rainey v. State,* 310 Ark. 419, 837 S.W.2d 453 (1992)). Thus, to qualify for the manslaughter instruction, there must be evidence of a provocation resulting in an extreme emotional disturbance. *Id.* The element of emotional disturbance may be proven by evidence of an external event calculated to arouse or provoke a reasonable person to take the actions that resulted in the victim's death. *Bankston v. State,* 361 Ark. 123, 129, 205 S.W.3d 138, 143 (2005).

Here, Jackson argues that there was evidence that he was provoked to shoot Cobb by witnessing the altercation between Cobb and his brother, an altercation that, by all accounts, Cobb was winning. He also notes that there was testimony that he and his brother were very close and that he looked out for Freeman. However, Jackson points to no evidence that Cobb's actions in fighting Freeman

were calculated to provoke Jackson to take action.

We also note that, after shooting Cobb in the thigh, there was a delay of a minute or two before Jackson fired the fatal shot to Cobb's head. Moreover, during this interval of time, Ward and Freeman exhorted Jackson not to shoot Cobb. In light of this evidence, we cannot say that the trial court abused its discretion in finding that no rational basis existed for giving the jury Jackson's requested manslaughter instruction.

## VI. Medical Examiner's Report

■ Jackson's final point on appeal concerns the circuit court's decision to allow the jury to take the medical examiner's report with them into the jury room during deliberations. During Dr. Peretti's testimony, the State moved to introduce the medical examiner's autopsy report, which detailed his medical findings and conclusion as to the manner of Cobb's death. Jackson objected, arguing that admitting the report in addition to Dr. Peretti's testimony was simply "bolstering" and "cumulative" since the doctor had already testified. The trial court allowed the State to introduce the report at State's Exhibit 6. The court also allowed the State to supplement the autopsy report with the State Crime Lab's toxicology report. When the jury retired to begin deliberations, Jackson objected to the jury taking the report with them, stating that the report contained information that was not in evidence; however, the court overruled the objection.

On appeal, Jackson does not challenge the trial court's initial ruling allowing the report to be admitted into evidence; rather, he argues that the court erred in letting the jurors take the report with them into the jury room, reiterating his argument that the report contained evidence that had never been presented to the jury.

Therefore, he claims, because neither he nor his attorneys were present when the jury received this evidence, his right to be present at a critical stage of the proceedings was violated, and prejudice must be presumed under *Davlin v. State*, 313 Ark. 218, 853 S.W.2d 882 (1993).

Arkansas Code Annotated § 16–89–125(d)(3) (Repl.2005) provides that, "[u]pon retiring for deliberation, the jury may take with them *all papers which have been received as evidence* in the cause." (Emphasis added.) In *Anderson v. State*, 367 Ark. 536, 242 S.W.3d 229 (2006), this court held that, where a videotaped statement had been introduced into evidence, it was not error for the trial court to allow the jury to have the videotape in the jury room during deliberations because the defendant had been present when the tape was played and introduced during trial. *Anderson*, 367 Ark. at 542–43, 242 S.W.3d at 234. Similarly, in the instant case, because the report was introduced into evidence during the trial, while Jackson was present and represented by counsel, the circuit court did not err in sending the report with the jury during deliberations.

In *Flanagan v. State*, 368 Ark. 143, 167, 243 S.W.3d 866, 883 (2006), this court concluded that the jury's taking exhibits (in that case, audiotapes and videotapes of out-of-court statements) that had been admitted into evidence and made exhibits at trial was not a critical stage of criminal proceedings. Therefore, the defendant's presence would not have contributed to the fairness of the proceedings. *Id.* (citing *Anderson, supra*). Similarly, here, as noted above, the report had been admitted into evidence. Although the report may have contained some details about which Dr. Peretti did not testify, this would merely have constituted cause to move for redaction of portions of the exhibit, which Jackson did not do. However, the report

had been admitted as an exhibit, and therefore, under § 16–89–125(d)(3), the court did not err in sending it back with the jury.

*VII.  Rule 4–3(h) Review*

The record in this case has been reviewed for reversible error pursuant to Supreme Court Rule 4–3(h), and none has been found.