Cardrick Deon FLOWERS *v.* STATE of Arkansas

CA CR 04-701 210 S.W.3d 907

Court of Appeals of Arkansas
Opinion delivered June 22, 2005

*Patrick J. Benca*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.

ROBERT J. GLADWIN, Judge. A Jefferson County jury found Cardrick Deon Flowers guilty of aggravated robbery, theft of property, and possession of firearms by certain persons. He was sentenced to an aggregate term of forty years' imprisonment. He raises two points on appeal: (1) the uncorroborated testimony of an accomplice was insufficient to support his convictions; and (2) the trial court erred in denying his motion for mistrial when the prosecutor made an improper remark in closing argument regarding his decision not to testify. We affirm.

A jury trial was held on February 18 and 19, 2004. Danielle Dante Shaw, an employee at a McDonald's restaurant in Pine Bluff, testified that on March 5, 2003, at approximately 11:00 p.m., she took out the trash as the restaurant prepared to close. She saw a car with three male occupants drive around the restaurant. When she had finished with the trash and was going back inside the restaurant, she noticed the same car going into the Total gas station and only one male was inside the car at that point. As she was closing the back door of the restaurant, a man grabbed the door, put a gun in front of her face, and told her not to say anything. The man turned her around, stuck the gun against her back, and told her to take him to the manager and the money. Once inside, he suddenly pushed her toward the sink area, and he and another man ran past her into the front area of the restaurant. Shaw ran out a side door and called the police. According to her, the first man, later identified as appellant, wore a black jacket and had pulled his shirt over his face revealing only his eyes. She also described him as very dark and skinny. She did not get a good look at the second man.

Kenneth J. Lee, Jr., another employee at McDonald's, testified that he was cleaning the grill when two men came inside the restaurant with Shaw in front of them. Lee identified a silver Ruger handgun and testified that the man who held that gun, later identified as Vic Norman, wore a black "bubble" jacket with a hood over his head. He stated that the other man, appellant, carried a black gun and wore a thin, dark blue or black jacket with his t-shirt pulled over half of his face. While Norman kept his gun pointed at Lee, appellant went to the front of the store and came back with the manager. Both robbers went into an office with the manager and then ran out the back door. Appellant carried till drawers, and Norman carried a bag that he pulled money out of and stuffed in his pockets. Lee said the men ran toward the Total gas station, which was near the Comfort Inn.

Yalonda Smith testified that she was working at the restaurant's drive-through window that night and saw a white Lincoln drive around the restaurant twice. She was sitting with the manager and Lee's girlfriend at the front of the restaurant when appellant, who had his t-shirt pulled over his nose, approached with a gun in his hand. Appellant told the manager to take him to the money. Yalonda and the manager walked toward the back of the store, and she saw another man, Norman, with a silver gun. Yalonda described him as skinny and very dark complected and

said that he wore a "puffy" black coat. She was ordered to lie down on the floor, and the manager went inside an office to open the safe.

Shenita Smith was at McDonald's that night to pick up her boyfriend Lee. She was sitting with the manager when appellant, who had his shirt pulled over his face, walked up and told them to open the safe. When neither one of them moved, appellant pointed his gun at them and told them again to open the safe. When the manager and Yalonda began walking toward the back of the store, Shenita suddenly ran out a side door that had not been locked and dialed 911 on a cell phone that the manager had slipped to her. She described appellant as tall, "kind of buff," stocky, and muscular. She said he had a black gun. Shenita said that from where she had been sitting, she could see another man near the back door and that he had a coat on with a hood covering his head.

Lawrence Joseph Warfield, the manager at McDonald's, testified that he was sitting at a table completing a truck order when appellant approached, pointed a gun at him, and told him to take him to the safe. Warfield said that appellant wore a thin black jacket and a white t-shirt that he used to cover part of his face. When he took the man to the safe, Warfield saw a second man, Norman, with a silver gun. He said that Norman wore a black "puffy" coat. Warfield opened the safe, and the men removed cash drawers that contained approximately $1,200. Warfield described Norman as "a skinny fellow" and more dark complected than appellant.

Vic Norman, an inmate at Cummins Prison, testified that he entered into a plea negotiation with the State in which he agreed to testify against his co-defendants in exchange for twenty years' imprisonment for aggravated robbery. Norman said that, on the night in question, appellant called him and asked him to go to Pine Bluff to see Alvin Akins. The two men traveled in a white Lincoln. Norman stated that he left Little Rock with a nine-millimeter Ruger and wore a navy blue or black "goose jacket," a jersey, and jeans. The two men picked up Akins, and they drove around Pine Bluff drinking some alcohol they had purchased. Appellant, who had been driving, became inebriated to the point that Akins got behind the wheel. The three men drove into the McDonald's parking lot, saw someone taking out the trash, and decided to rob the restaurant. According to Norman, he and appellant entered the restaurant with guns. At trial, Norman identified the guns that he and appellant carried that night. Norman stayed in the back of the

restaurant, while appellant went to the front. Norman said that he covered his face with the hood of his coat. They forced the manager to open the safe, took the money and cash drawers, and ran out the back door to an area behind the Comfort Inn. They got back into the vehicle with Akins, and the police arrived shortly afterwards. Although the police ordered the men to stop, Akins did not stop the car until it was blocked by police with a patrol unit, at which point Akins put the car in reverse. Akins then fled on foot, and the police opened fire. Norman exited the car with his gun and was also shot at by the police. At trial, Norman identified the jersey he wore and noted the hole from the gunshot wound he received.

Officer Buddy L. Earnest with the Pine Bluff Police Department testified that a police car blocked the robbers' Lincoln and that the driver put the car into reverse and narrowly missed hitting him as well as two other officers. The driver made a U-turn; the car jumped a curb; and the car was driven into a field where it got stuck in the mud. Earnest saw Norman exit the vehicle from the front passenger's seat.

Todd Parent, formerly an officer with the Pine Bluff Police Department, testified as to the same events Officer Earnest described, but he saw both Norman and the driver, Akins, exit the Lincoln. In his pursuit of Akins, Parent ran past the Lincoln and noticed appellant slumped over in the back seat. Thinking that appellant was shot and critically injured, Parent continued to pursue Akins. After Akins was taken into custody, appellant was apprehended.

Adam Owings, formerly an officer with the Pine Bluff Police Department, arrived on the scene with Parent. His testimony was similar to Parent's, but he identified the blue-and-white jersey worn by Norman, who had pointed a gun at him. Lieutenant James F. Cooper with the Pine Bluff Police Department testified that he found a .22 pistol on the floorboard of the driver's seat of the white Lincoln Town Car. Officer Rick Bunting with the Pine Bluff Police Department testified that he found appellant hiding inside a dumpster and that appellant had been shot in the shoulder on the back.

Cathy Ruhl and Johnny Bumpass, crime scene technicians, identified several exhibits from their processing of the crime scene. Specifically, they identified several articles of clothing and two guns, which the witnesses who were employees of McDonald's had previously identified as those belonging to appellant and Norman.

The State then rested, and appellant's counsel moved for a directed verdict on each count. Appellant argued that, other than the "testimony of the accomplice Mr. Vic Norman," there was no independent corroborating evidence to link appellant to the crimes. The State argued that Norman's testimony had been corroborated, and the court agreed. The trial court denied the motion, finding that the "accomplice's testimony" had been sufficiently corroborated by other evidence. After discussing other matters, appellant's counsel submitted a jury instruction on accomplice testimony, which the court accepted.

Robert Eugene Flowers, appellant's father, testified next. Flowers testified that the Lincoln belonged to him and that appellant had borrowed the car on the night in question. He stated that he knew his son was a convicted felon but that he had a .22 derringer under the front seat of the car. According to Flowers, appellant did not know the gun was there. He stated that, had he been home when appellant borrowed the car, he would have removed the gun.

Appellant renewed his motion for a directed verdict, and the trial court denied the motion. The trial judge then instructed the jury, including the instruction about accomplices. The judge specifically stated, "Now, it is contended that the witness, Vic Norman, was an accomplice." During closing arguments, the prosecutor said:

> What you need to understand, at this time, the only people who truly know everyone that's involved in what has gone on and what has transpired is (sic) the defendant and his two accomplices. They are the only ones.

Appellant objected, arguing that the prosecutor had commented on the fact that he did not take the stand and testify. The prosecutor began to argue, but the trial judge interrupted, stating, "We're going to make a record on that. I'm going to let him finish. You've got a minute to wrap it up and we'll talk about that. I'm going to let him finish his argument." After the State finished its closing argument, the jury retired to deliberate. At that point, appellant moved for a mistrial based on the prosecutor's improper remarks. The State responded that it was simply rebutting appellant's argument. The prosecutor contended that, if his comment

referred to appellant's failure to testify, it was unintentional and that he simply meant that appellant and his accomplices were the only people who could possibly know what happened. In the meantime, the jury returned with its verdict, convicting appellant of aggravated robbery, theft of property, and possession of firearms by certain persons.

In the sentencing phase of the trial, the jury heard testimony from appellant's mother, Idelle Flowers. The judge instructed the jury; the State and appellant made closing arguments in regard to sentencing; the judge made a final instruction; and another hearing took place. Counsel for appellant asked for an opportunity to argue in support of her motion for mistrial. The judge discussed a two-prong test and reserved the right to decide on the mistrial "because what [the jury] ultimately decide[s] would certainly seem to me to be a factor in determining the second part of that two-prong test." The jury then announced its agreement as to sentencing, and the jury was dismissed. A hearing on the mistrial motion and sentencing was held on March 18, 2004. The trial judge found:

> [T]hat the comments by the prosecutor at that time were inappropriate and that they were indicative of bringing to the attention of the Court, I mean, the trier of fact, the jury, the fact that the defendant did not testify.
>
> Now, in examining the — examining the case law and examining the exact language that was used during the closing argument, the offensive language in this case, the Court, again, has compared that with the language that is mentioned in all of the cases that are reported that have the exact language and certainly mentioned in there and the Court is of the opinion, at this point, that the prosecutor was probably saved by a timely objection. It appears that the very next comment probably would have put those comments over the edge and would have caused the Court to have no recourse other than to declare a mistrial.
>
> The Court is of the opinion that the offending language is not sufficient to grant a mistrial. . . .

### I. Accomplice Corroboration

On appeal to this court, appellant argues that the uncorroborated testimony of an accomplice was insufficient to support his

convictions. Appellant concedes that the crime was independently established but argues that the remaining evidence did not tend to connect him with its commission. Appellant admits that the evidence put him in proximity of the crime but contends that there was not substantial evidence of his guilt, other than Norman's testimony.

The State, relying on *Windsor v. State*, 338 Ark. 649, 1 S.W.3d 20 (1999), contends that appellant's argument is not preserved because Norman was never declared by the court to be an accomplice and because it is not clear from the jury's verdict forms whether it considered Norman to be an accomplice. The defendant bears the burden of proving that a witness is an accomplice whose testimony must be corroborated. *Windsor, supra.* A defendant must either have the trial court declare a witness to be an accomplice as a matter of law or submit the issue to the jury for determination. *Id.* In *Windsor,* Windsor never requested at trial that a witness be declared an accomplice, did not request that the witness's status be submitted to the jury for determination, and did not even request a jury instruction to the effect that the testimony of an accomplice requires corroboration. Accordingly, our supreme court held that Windsor's failure to have a witness declared an accomplice or to have the jury consider it precluded Windsor from raising the witness-corroboration rule on appeal.

The facts, however, in the case at bar are more akin to the facts in *Brown v. State*, 82 Ark. App. 61, 110 S.W.3d 293 (2003), where the Arkansas Court of Appeals noted that it was clear from the record that the court, the defense counsel, and the prosecutor all accepted the fact that certain witnesses were accomplices. In that case, the court unambiguously found certain witnesses to be accomplices, regardless of the omission of an express declaration to that effect. Here, not only did the defense counsel, the prosecutor, and the court refer to Norman as an accomplice, a jury instruction on accomplice testimony was submitted to the jury. A defendant must *either* have the trial court declare a witness to be an accomplice as a matter of law *or* submit the issue to the jury for determination. *Windsor v. State*, 338 Ark. at 656, 1 S.W.3d at 24 (emphasis added). Appellant's argument is therefore preserved for review on appeal; however, his challenge to the sufficiency of the evidence must nevertheless fail.

When reviewing the sufficiency of the evidence, we determine whether there is substantial evidence to support the

verdict, viewing the evidence in a light most favorable to the State. *Tate v. State*, 357 Ark. 369, 167 S.W.3d 655 (2004). Arkansas Code Annotated section 16-89-111(e)(1) (1987) provides that a person cannot be convicted of a felony based upon the testimony of an accomplice, unless that testimony is "corroborated by other evidence tending to connect the defendant with the commission of the offense." Corroboration is not sufficient if it merely establishes that the offense was committed and the circumstances thereof. *Martin v. State*, 346 Ark. 198, 57 S.W.3d 136 (2001). It must be evidence of a substantive nature since it must be directed toward proving the connection of the accused with a crime and not directed toward corroborating the accomplice's testimony. *Id.* The corroborating evidence need not be sufficient standing alone to sustain the conviction, but it must, independent from that of the accomplice, tend to a substantial degree to connect the accused with the commission of the crime. *Rhodes v. State*, 276 Ark. 203, 634 S.W.2d 107 (1982). The test is whether, if the testimony of the accomplice were completely eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission. *Marta v. State*, 336 Ark. 67, 983 S.W.2d 924 (1999). The corroborating evidence may be circumstantial so long as it is substantial; evidence that merely raises a suspicion of guilt is insufficient to corroborate an accomplice's testimony. *Gordon v. State*, 326 Ark. 90, 931 S.W.2d 91 (1996).

■■ The evidence established that appellant had borrowed the Lincoln getaway car from his father on the night of the robbery. Witnesses from McDonald's testified regarding the role appellant played in the robbery and described his clothing and weapon, which items were collected at the scene. Appellant's jacket had blood stains on it and a hole corresponding to the location of the gunshot wound he received. Appellant was found hiding inside a dumpster near the site where the Lincoln became stuck in the mud. The presence of an accused in the proximity of a crime in a manner suggestive of joint participation is a relevant factor in determining an accomplice's connection to a crime. *Stewart v. State*, 338 Ark. 608, 999 S.W.2d 684 (1999). Moreover, evidence of flight to avoid arrest may be considered by the jury as corroborative of guilt. *Ross v. State*, 346 Ark. 225, 57 S.W.3d 152 (2001). In the case at bar, evidence other than Norman's testimony

tends to establish the crime, and, to a substantial degree, connect appellant with its commission.

## II. Motion for Mistrial

 Next, appellant contends that the trial court erred in denying his motion for mistrial because the prosecutor improperly remarked on his decision not to testify. The law is well settled that to preserve an issue for appeal, a defendant must object at the first opportunity. *Ferguson v. State*, 343 Ark. 159, 33 S.W.3d 115 (2000). Similarly, motions for mistrial must be made at the first opportunity. *Id*. The policy reason behind this rule is that a trial court should be given an opportunity to correct any error early in the trial, perhaps before any prejudice occurs. *Id*.

 Here, appellant immediately objected to the prosecutor's remark but did not at that time request a mistrial; instead, appellant waited until after the prosecutor had finished his closing argument. When an objection to a statement during closing argument is sustained, an appellant has been given all the relief requested; consequently, there is no basis to raise the issue on appeal unless the appellant requests an admonition to the jury or a mistrial. *Leaks v. State*, 339 Ark. 348, 5 S.W.3d 448 (1999). On the other hand, when an objection to the prosecutor's closing argument is clearly overruled, an objection without a request for further relief is sufficient to preserve the argument for review. *See id*. In the case at bar, the trial court's ruling was unclear, and, of course, the burden of obtaining a ruling is on the movant. *See Jenkins v. State*, 60 Ark. App. 1, 959 S.W.2d 57 (1997).

 Even if appellant's motion for mistrial were not untimely, the prosecutor's remarks were not an impermissible comment on appellant's failure to testify or even a veiled reference to such. The prosecutor's statement asserted only that appellant knew what he had done because he was guilty. Moreover, the jury was instructed that appellant had an absolute constitutional right not to testify and that the fact that he did not testify was not evidence of guilt and could not be considered. A mistrial is an extreme remedy and is proper only when an error is so prejudicial that justice cannot be served by continuing the trial and when it cannot be cured by an instruction. *Gates v. State*, 338 Ark. 530, 2 S.W.3d 40 (1999). The decision to grant a mistrial is within the sound discretion of the trial court. *Id*. Under these circumstances,

the trial court did not abuse its discretion in denying the motion, had the argument been preserved for appeal.

Affirmed.

HART and ROAF, JJ., agree.