2011 Ark. App. 573

**Sheva HOWARD, Appellant**

**v.**

**STATE of Arkansas, Appellee.**

**No. CA CR 11–29.**

Court of Appeals of Arkansas.

Sept. 28, 2011.

Rehearing Denied Nov. 9, 2011.

Hurst Q. Byrum Jr., Hot Springs, for appellant.

Dustin McDaniel, Atty. Gen., by: Ashley Argo Priest, Little Rock, for appellee.

DOUG MARTIN, Judge.

Appellant Sheva Howard was charged by information with one count of Class C felony theft of property.[1] Howard was tried by a Pulaski County jury and convicted of theft of property; she was sentenced to five years' supervised probation, a term of sixty days in the Pulaski County jail, a $5000 fine, and 200 hours of community service. On appeal, she raises four arguments: 1) there was insufficient evidence to support her conviction; 2) the State's use of peremptory challenges to exclude black members of the venire violated *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); 3) the trial court erred in denying her motion for mistrial during the State's closing arguments; and 4) the trial court erred in allowing the State to introduce evidence of "prior bad acts" pursuant to Arkansas Rule of Evidence 404(b). We find no error and affirm.

Howard, a part-time security guard for Dillard's, was convicted of theft of property for shoplifting three Coach handbags from Dillard's on August 8, 2009. A person commits theft of property if she knowingly "[t]akes or exercises unauthorized control over or makes an unauthorized transfer of an interest in the property of another person with the purpose of depriving the owner of the property[.]" Ark. Code Ann. § 5–36–103(a)(1) (Repl.2006). Theft of property is a Class C felony if the value of the property is less than $2500 but more than $500. Ark.Code Ann. § 5–36–103(b)(2)(A) (Repl.2006).[2] In her first point on appeal, Howard contends that her theft conviction was not supported by sub-

stantial evidence. In doing so, she raises two separate issues, arguing first that the State failed to prove the value of the handbags and, second, that the State failed to prove that she knew the handbags were in the Dillard's shopping bag she was seen carrying.

The test for determining the sufficiency of the evidence is whether substantial evidence, direct or circumstantial, supports the verdict. *Lockhart v. State*, 2010 Ark. 278, 367 S.W.3d 530. Substantial evidence is evidence of sufficient certainty and precision to compel a conclusion one way or another and pass beyond mere suspicion or conjecture. *Id.* Furthermore, this court views the evidence in the light most favorable to the verdict, and only evidence supporting the verdict will be considered. *Rounsaville v. State*, 2009 Ark. 479, 346 S.W.3d 289. Circumstantial evidence may be sufficient to support the finding of guilt in a criminal case, but it must exclude every other reasonable hypothesis consistent with innocence. *Lockhart, supra; Bennett v. State*, 297 Ark. 115, 759 S.W.2d 799 (1988). In addition, the credibility of witnesses is an issue for the jury and not this court. The fact-finder is free to believe all or part of the witness's testimony and to resolve questions of conflicting testimony and inconsistent evidence. Rather than reweighing the evidence presented at trial, this court determines whether there is substantial evidence to support the lower court's findings. *Freeman v. State*, 331 Ark. 130, 959 S.W.2d 400 (1998).

1. The charge was originally filed as a misdemeanor, but the State moved to amend the information to a felony count on April 28, 2010.

2. Arkansas Code Annotated section 5–36–103 was amended by Act 570 of 2011 to make theft of property a Class C felony if the value of the property is less than $25,000 but more than $5,000. *See* Ark.Code Ann. § 5–36–103(a)(2)(A) (Supp.2011). Because the offense in this case took place in 2009, the previous version of the statute applies.

■ Howard's first argument pertains to the value of the Coach purses. At trial, Anielle Babinski testified that, in August 2009, she was the accessories sales manager for Dillard's. Babinski identified the three Coach handbags and testified, without objection, that two of the bags had retail prices of $198, as reflected on the attached Coach labels and price tags, and the third bag had a retail price of $268, which Babinski ascertained by looking the bag up on the store computer.

Howard argues on appeal that there was "no evidence . . . of the cost to Dillard's to replace the purses," and she further contends that there was no proof of the amount Dillard's had paid for the purses. Howard notes Babinski's testimony on cross-examination wherein she stated that Howard could have purchased the handbags with a Dillard's employee discount of 25%, thus lowering their "purchase price" to $498. Howard suggests that this discrepancy in the "price" of the purses caused the jury to have to speculate as to the value of the stolen property, and as such, the evidence was insufficient to support her conviction.

■ Howard's argument is misplaced. In the prosecution of a theft-of-property charge, the State has the burden of establishing the value of the property. *Reed v. State*, 353 Ark. 22, 109 S.W.3d 665 (2003); *Pace v. State*, 2010 Ark. App. 491, 375 S.W.3d 751. "Value" is defined as the market value of a property or service at the time and place of the offense or, if the market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense. Ark.Code Ann. § 5–36–101(12)(A)(i) (Supp.2007); *see also Pace, supra.* Value may be sufficiently established by circumstances that clearly show

a value in excess of the statutory requirement, including through the testimony of a witness who actually knows the value of the property. *See Moss v. State*, 2010 Ark. App. 96, 2010 WL 374178. In the prosecution of a theft committed from a retail merchant, the State may prove the fair market value of the property at issue by presenting the testimony of a store employee who has personal knowledge of the fair market value of the property at issue. *Id.*

Babinski's testimony, offered without objection, demonstrated her knowledge of the value of the handbags.[3] Further, her knowledge was based on the price tag on two of the stolen handbags and the store's computer records showing the price of the third handbag. Where evidence of value in excess of the statutory requirement is introduced in the form of a price tag, introduced without objection, it is sufficient to establish the value of the stolen property. *See Boone v. State*, 264 Ark. 169, 568 S.W.2d 229 (1978).

■ Next, Howard argues that there was insufficient proof that she knowingly had the handbags in her possession. When recovered, the stolen handbags were in an oversized Dillard's shopping bag. Howard asserts that there was no proof that she ever knew that the handbags were in the shopping bag. This argument, too, is without merit.

According to the testimony introduced at trial, when a Dillard's employee wishes to purchase something from the store, such purchase is not to be made during the employee's time on the clock. In addition, if an employee does purchase something, the item is to be taken to the customer-service office to be "package passed,"

---

**3.** That Babinski testified that the bags "could have" been purchased at a lower price with an employee discount is of no moment, as the purses were obviously not purchased.

which means that the employee presents the receipt and the item that was purchased, and the bag is then securely taped and kept in the customer-service department until the end of the employee's shift. Employees are not supposed to put purchases for other employees in the handbag stockroom, nor should an employee carry around his or her purchase while on duty.

Anielle Babinski testified that, in the month leading up to August 8, 2009, Howard contacted Babinski repeatedly, trying to purchase handbags and damaged handbags at a discounted price. Babinski said that she eventually stopped allowing Howard to purchase discounted handbags because Howard had approached her so many times, it was "almost an annoyance." Babinski stated that she frequently observed Howard in the handbag department with Regina Hampton, a sales associate in that department.

As noted, Babinski identified at trial three Coach handbags, two of which had been removed from the stockroom. She explained that Coach bags were not sold "off the floor" but were instead only sold out of the stockroom. The bags stored in the stockroom were left in their plastic wrappings to keep them from being damaged. According to the Dillard's inventory system, there were supposed to be four pink Coach bags of a particular style: one on the sales floor and three in the stockroom. Two of the three that were supposed to be in the stockroom were missing out the store's inventory, however, as was a tan bag. Babinski stated that the only people who had access to the stockroom were sales associates who worked in the handbag department.

Babinski also identified the large Dillard's shopping bag in which the Coach purses were found. She stated that the Dillard's bag was an oversized bag that was normally used in the bedding department and was not something that would ordinarily be used in the handbag department, nor was it usually stocked in that department. Babinski also noted that, while there was a sales receipt in the oversized shopping bag, along with a white Guess purse and the three Coach purses, the receipt showed that only the Guess purse—and none of the Coach purses—had been purchased.

Kelly Brimley, an employee of Dillard's, testified that she was one of Regina Hampton's coworkers in the handbag department. Brimley said that she saw Howard, who was on-duty working as a security officer, in the handbag department on the evening of August 8. On that evening, Brimley observed Hampton place an oversized Dillard's shopping bag in the corner of the stockroom.

Lauren Perme, another sales associate in the handbag department, testified that the Coach purses that Dillard's sells are kept in the stockroom, which is secured by a keypad to which only handbag employees have the key code. Although no one other than handbag employees are supposed to be in the stockroom, Perme said that she had seen Howard in the stockroom with Hampton, rummaging through the Coach purses. About three weeks prior to the incident at issue in this case, Perme saw Howard come out of the stockroom with a Dillard's shopping bag that Howard did not have with her when she entered the stockroom.

Lemiece Kimbrough worked for Dillard's in the "camera room" on the east end of the mall,[4] observing activity on the store's surveillance cameras. On August

---

4. The Little Rock Dillard's store has two separate stores on each end of Park Plaza Mall: the west side, where the handbag department is located, and the east side, where the men's Polo department is located.

8, 2009, Kimbrough observed Howard at the handbag-department register. After leaving the handbag department, Howard came to see Kimbrough in the camera room; when she arrived, Howard was carrying a Dillard's shopping bag that Howard said she had taped up herself. Kimbrough asked Howard what she had purchased, and Howard opened the bag up just enough so that Kimbrough could see a white purse, along with a "glimpse" of another item with the Coach "C" emblem on it.

Kimbrough explained that Dillard's policy is for all employees to have their purchases sealed in shopping bags with yellow tape. Kimbrough, who was authorized to seal packages for employees, said that, if an employee came to her to get a purchase secured and that employee was still on the clock, the policy was for the purchase to be left with Kimbrough so she could secure it. On the evening in question, Kimbrough said, Howard did not leave her purchase in Kimbrough's office, even though she was on the clock at that time. Howard said she was taking the shopping bag to her vehicle; however, after Howard left the camera room, Kimbrough observed her on the security cameras, and Howard did not take the package to her car. Instead, Howard went to the men's Polo department.

Jermaine Starks was working in the Polo department that evening. About 8:30 p.m., Starks saw Howard come to the Polo department carrying a Dillard's shopping bag. Starks found that strange because employees are not allowed to carry their purchases around unless they are off work. When Howard arrived in the Polo department, she set the large shopping bag, which appeared to have items in it, behind the register. Howard then left and said she was going to get something to eat. The manager on duty, Eddie Carter, came over and asked Starks about the shopping bag; Starks said that it belonged to Howard, and Carter took the bag and left.

Carter testified that he had been advised to check on a "house package" that evening. A "house package" is the term used by Dillard's for a purchase made by an employee while he or she is on the clock, and such packages are supposed to be taped up and kept in a secure area until the employee's shift is over. Carter said that the package behind the counter in the Polo department looked suspicious to him, in part because it should never have been left on the floor in the first place. Carter noted that there was a receipt in the shopping bag that listed one item, but when he looked in the bag, he saw that there were two handbags clearly visible in it. Carter, who was familiar with the codes for various handbags, testified that the receipt did not reflect a purchase of a Coach handbag. Carter said that he was able to determine from the sales receipt that the employee who rang up the purchase was Regina Hampton.

When Carter picked up the shopping bag, he thought it felt heavy, as though there was more than just one handbag in it. He also thought the bag was "taped oddly," in a manner that was not the proper way to seal a "house package." Carter also said that the shopping bag was "much too large for handbags." He also noted that the bag should never have been brought to the east side but should instead have been sealed up and left with the customer-service office on the west end. When he saw that there were two handbags in the shopping bag, but only one item on the receipt, Carter immediately took the bag to the executive office on the west side and gave it to Willie Robinson, the head of Dillard's security.

Robinson testified that he had placed extra surveillance on Howard in the month

leading up to August 2009. Robinson explained that Howard had started purchasing handbags nearly every weekend, saying that they were damaged. On August 8, 2009, Robinson had a conversation with Lemiece Kimbrough about Howard's strange behavior that day and directed Kimbrough to keep a security camera on Howard. When Carter brought him the shopping bag, Robinson looked inside and saw the white Guess purse and the Coach purse. Shortly after, Robinson was called away on a security matter, but he secured the shopping bag in the assistant store manager's office.

Jeff Russell, the assistant store manager, testified that he retrieved the shopping bag from his office when he arrived at work on August 10, 2009. When he looked in the bag, he initially saw two purses. When he lifted the white purse, however, it felt noticeably heavy, so he opened it and discovered two other Coach purses stowed inside. From the receipt inside the bag, Russell was able to tell that only one of the purses had been purchased.

The State's final witness was Beth Bakalekos, a detective with the Little Rock Police Department who was assigned to investigate the Coach theft. Bakalekos reviewed the footage from the surveillance cameras and developed a timeline of the events of the evening of August 9. At the beginning of the video, Bakalekos observed Howard and Regina Hampton in the handbag department. On the film, Hampton went into the stockroom, where the shopping bag was already located, and came out a few seconds later; at this time, handbag-department employee Kelly Brimley was inside the stockroom. After Brimley left the stockroom, the video showed Hampton re-enter the stockroom, remain there for thirty to forty-five seconds with the door closed behind her, and reemerge from the stockroom carrying the Dillard's shopping bag. Shortly thereafter, Howard was seen walking toward the east end of Dillard's with the shopping bag. In reviewing the video, Bakalekos observed that the only people on the security footage who touched the bag with the stolen Coach purses were Howard, Regina Hampton, and Eddie Carter.

Several days later, Bakalekos made contact with Hampton at Hampton's home. While there, Bakalekos noticed photographs of Hampton and Howard together and surmised that they had a close relationship. Phone records introduced at trial indicated that Howard and Hampton called and texted each other repeatedly in the days surrounding the theft, including nineteen text messages between them before the theft occurred, a text message sent within nine seconds of Howard leaving the security room on the night of the theft, and thirty-six phone calls between Howard and Hampton after the purses were stolen. Bakalekos described another "flurry" of phone calls just after she left Hampton's house.

On appeal, Howard argues that there was no proof that she ever looked into the Dillard's shopping bag, and therefore, there was no proof that she knew the purses were in the shopping bag. She argues that the State's case was entirely circumstantial and that the jury was left to resort to speculation and conjecture to conclude that she had stolen the purses.

While the case may have been somewhat circumstantial, the jury was not required to set aside its common sense to be able to determine that Howard knew that the stolen purses were inside the shopping bag. The evidence showed that Howard had repeatedly expressed interest in purchasing Coach purses, to the point of annoying the sales manager, and she had been seen rummaging through the Coach purses with Regina Hampton in the stockroom in viola-

tion of store policy. Howard purchased one purse that was placed in an oversized shopping bag, and then Hampton, who had access to the stockroom, placed the oversized bag in the stockroom and then waited until the stockroom was empty to slip inside. When the bag was later opened and looked into, it contained not only the purse that Howard had purchased, but a Coach purse that did not appear on the sales receipt; subsequently, two other Coach purses that were missing from the stockroom's inventory were found inside the purchased purse. Until Eddie Carter picked up the shopping bag from the men's Polo department, the only people seen in possession of the shopping bag were Howard and Hampton. Other witnesses testified that the shopping bag felt too heavy to contain only one purse.

From this evidence, the jury could conclude, without resorting to speculation and conjecture, that Howard and Hampton colluded to steal the Coach purses and that Howard knew there were purses in the shopping bag that she had not paid for. Accordingly, substantial evidence supported Howard's conviction.

In her second argument on appeal, Howard argues that the circuit court erred in denying her challenge, during voir dire, to the State's exercise of peremptory strikes against the only two African–American members of the venire. Howard, who is African–American, argues that the State failed to provide a race-neutral reason for striking Juror Hunt from the jury panel.[5]

A prosecutor may not use peremptory strikes to exclude jurors solely on the basis of their race. *Jackson v. State*, 375 Ark. 321, 290 S.W.3d 574 (2009); *Hawkins v. State*, 2011 Ark. App. 164, 2011

WL 714991. Once a *Batson* objection is made, the circuit court must conduct a three-step inquiry to determine whether a violation occurred. *Jackson, supra.* First, the opponent must present facts demonstrating a prima facie case of purposeful discrimination. *Id.* Second, the burden shifts to the State to produce a racially neutral explanation for the strike. *Id.* The explanation must be more than a mere denial of discrimination or an assertion that a shared race with the opponent would render the challenged juror partial to that opponent. *Id.* The explanation need not, however, be persuasive or even plausible but can be silly or superstitious. *Williams v. State*, 338 Ark. 97, 991 S.W.2d 565 (1999). The stated reason will be deemed racially neutral unless a discriminatory intent is inherent in the prosecutor's explanation. *Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). When the State provides a race-neutral explanation, the initial presentation of a purposeful discriminatory strike is rendered moot. *Holder v. State*, 354 Ark. 364, 124 S.W.3d 439 (2003). Third, the circuit court must decide whether the opponent of the strike has demonstrated purposeful discrimination. *Hawkins, supra.* The ultimate burden of persuasion never shifts from the opponent of the strike. *Purkett, supra.* A circuit court's ruling on a *Batson* challenge is reversed only if the findings of fact are clearly against the preponderance of the evidence. *Holder, supra.*

During voir dire, the State sought to exercise one of its peremptory challenges on Juror Hunt. Howard immediately raised a *Batson* challenge, asserting that there was nothing in any of Juror Hunt's responses that were different from those

---

5. Although the State exercised its peremptory challenges with respect to two African–American venire members, Howard concedes that the State provided a race-neutral explanation for striking one of them.

given by other individuals who had not been struck by the State. The prosecutor responded that she had had to call Juror Hunt's name three times before he responded, and that fact, combined with the fact that she did not have a juror questionnaire from Juror Hunt, made her uneasy. Howard disputed that the State had called Hunt's name three times and asserted that Hunt had, in fact, been raising his hand. The court, however, found the lack of a juror questionnaire to be a "legitimate cause."

When Howard sought clarification of the court's ruling, the court stated that it found that Howard had made a prima facie case but that the State had offered a race-neutral reason for the strike. Howard then argued that the prosecutor could simply ask Hunt the questions that were on the jury questionnaire, "if that was important to her," but she did not. Howard also contended that Hunt had raised his hand when his name had been called and argued that the State's "comfort level" was not important in determining whether there was a race-neutral reason for striking the juror. The court dismissed Howard's *Batson* challenge.

On appeal, Howard argues that the lack of the juror questionnaire cannot be a sufficient race-neutral reason to excuse "the last available African–American" from serving as a juror, especially where the State made no effort to obtain the information in any other manner. This court, however, has held that it could "discern no discriminatory intent" in the State's explanation that it peremptorily excused a juror because the juror had not filled out a questionnaire and was soft-spoken, among other reasons. *Riley v. State*, 2009 Ark. App. 613, at 8, 343 S.W.3d 327, 333; *see also Hawkins v. State*, 2011 Ark.App. 164 (holding that not filling out a juror questionnaire may provide a race-neutral reason for striking a particular potential juror).

Moreover, once the State gave its reasons in the present case, the burden was Howard's to prove that there had been purposeful discrimination. *See Williams v. State*, 2009 Ark. 433, 373 S.W.3d 237 (the ultimate burden of persuasion that there is a purposeful intent rests with and never shifts from the party opposing the strikes). Here, other than repeating what she had previously argued to the court, Howard offers no evidence demonstrating that the State engaged in purposeful discrimination. Accordingly, we cannot conclude that the circuit court's decision was clearly against the preponderance of the evidence.

In her third argument on appeal, Howard asserts that the trial court erred in denying her motion for mistrial during the prosecution's closing argument when, she contends, the State mentioned her failure to testify on her own behalf. During the State's closing argument, the following exchange occurred:

STATE: It's obvious to Mr. Russell. Remember Mr. Russell? He comes back, unlocks [the closet in his office], picks up the purse and says golly, this is too heavy for just one purse. That's Mr. Russell who doesn't carry purses day in and day out who's telling you how obvious that is. All that adds up to circumstantial evidence of [Howard's] knowing what's in that bag. Of her knowing what's in that bag, and it is the only reasonable explanation. It's the only one.

Now, finally, I want to say pictures are worth a thousand words. Look at that. That's that big. Look at that bag. Do you seriously—is that—seriously, someone's going to get up and say I had no idea that there was only,

there was more than one purse in there?

DEFENSE: Objection, ask to approach, Judge.

COURT: You may.

DEFENSE: Judge, I didn't call any witnesses, and she said she thinks somebody's going to get up and say that. That implies that the defendant should have testified.

STATE: I'm talking about defense counsel.

DEFENSE: No. That's not what she said. . . . I'm asking for a mistrial because it comments on my client's right to remain silent and that's clearly, clearly a violation.

COURT: No. I disagree [with] that. I'll deny it, and if you want to, if you want to—

DEFENSE: Judge, the problem with it is this. My client didn't testify.

COURT: I understand that.

DEFENSE: And she talks about somebody getting up and saying something. She's implying that my client should have got up and testified. She cannot do that. . . . [S]he has the right to remain silent.

COURT: Okay. There was testimony from the stand with respect to the appearance of the bag as being apparent, as having more than one bag in it.

. . . .

DEFENSE: Judge, who else would get up and testify about I didn't know? I don't remember what her words were. That someone's going to get up and say I didn't know what was in the bag, that they don't know what was in the bag? That's implying that my client had a responsibility to testify. She did not.

COURT: Well, you know, here's—

DEFENSE: I've made my record.

COURT: Okay. And thank you.

Our appellate courts have stated many times that the trial court is given broad discretion to control counsel in closing arguments, and we do not interfere with that discretion absent a manifest abuse of discretion. *Rohrbach v. State,* 374 Ark. 271, 287 S.W.3d 590 (2008); *Leaks v. State,* 339 Ark. 348, 5 S.W.3d 448 (1999). Closing remarks that require reversal are rare and require an appeal to the jurors' passions. *Rohrbach, supra.* Furthermore, the trial court is in the best position to evaluate the potential for prejudice based on the prosecutor's remarks. *Id.* Closing arguments must be confined to questions in issue, the evidence introduced during trial, and all reasonable inferences and deductions which can be drawn therefrom. *Id.* It is the trial court's duty to maintain control of the trial and to prohibit counsel from making improper arguments. *Id.*

Moreover, it is well settled that a mistrial is an extreme remedy that should be granted only when the error is beyond repair and cannot be corrected by curative relief. *Brown v. State,* 74 Ark. App. 281, 47 S.W.3d 314 (2001). A trial court has wide discretion in granting or denying a motion for a mistrial, and the appellate court will not disturb the court's decision absent an abuse of discretion or manifest prejudice to the movant. *Id.* Among the factors we consider on appeal, however, is whether the defendant requested a cautionary instruction or admonition to the jury, and the failure of the defense to request an admonition may negate the mistrial motion. *Rohrbach, supra.* Where the possible prejudice could have been cured by admonition by the trial court, our supreme court has found no abuse of discretion when defense counsel has refused the trial court's offer of such a

curative instruction. *Ferguson v. State,* 343 Ark. 159, 33 S.W.3d 115 (2000).

In this case, as seen from the colloquy above, Howard did not request an admonition to the jury. Her failure to do so, when such an admonition could have cured any prejudice from the allegedly improper statement, precludes relief on appeal. *See Weaver v. State,* 324 Ark. 290, 300, 920 S.W.2d 491, 496 (1996) ("When there is doubt as to whether the trial court abused its discretion, a failure to request an admonition will negate a mistrial motion."). Further, the trial court instructed the jury that Howard had an absolute constitutional right not to testify, and the fact that she did not testify was not evidence of guilt or innocence, and under no circumstance was to be considered by the jury in arriving at its verdict. Considering the entirety of the circumstances, it cannot be said that the trial court's decision to deny Howard's motion for mistrial constituted an abuse of discretion. *See Flowers v. State,* 92 Ark.App. 29, 210 S.W.3d 907 (2005) (where trial court instructed jury on defendant's constitutional right not to testify, there was no abuse of discretion in denying motion for mistrial based on prosecutor's alleged comment on defendant's failure to testify).

Finally, Howard argues that the circuit court erred in "repeatedly allow[ing] highly prejudicial evidence of prior bad acts to be admitted." Prior to trial, Howard sought to preclude the State from eliciting testimony from Dillard's management and other employees about their suspicions pertaining to Howard and her behavior regarding the purses. The State asserted that it did not intend to talk about any other previous crimes but said it would present testimony regarding Howard's knowledge of and predilection for Coach handbags. The court reserved ruling on the issue, deciding to wait until the matter came up during the trial.

During the course of the trial, several mentions were made of Howard's previous attempts to obtain Coach handbags. For example, during opening arguments, the State informed the jury that chief of security Willie Robinson had been suspicious of Howard's repeated purchases of Coach handbags and decided to place Howard under extra surveillance. Anielle Babinski testified that Howard contacted her repeatedly in attempts to get discounted Coach handbags; the court denied Howard's Rule 404(b) objection on the basis that "it probably does go to motive, plan, or absence of mistake." When Lauren Perme testified that she had seen Howard rummaging around in the stockroom and coming out of the stockroom with a purse in a Dillard's shopping bag, Howard objected and asked for a mistrial; the court overruled the objection and denied the mistrial motion, finding that the evidence was relevant with respect to Howard's plan or the absence of a mistake.

During Willie Robinson's testimony, Howard objected when the State asked if he had extra surveillance on Howard during the month leading up to August 2009; the court again overruled the objection, noting that the testimony was relevant to show a scheme or plan. Robinson then explained that Howard had been purchasing "a lot of handbags that she said were damaged."

On appeal, Howard argues that the repeated admission of "prior bad act testimony" tainted the jury; she asserts that the events about which the witnesses testified were "really nothing more than suspicions and suppositions that something improper was going on." According to Arkansas Rule of Evidence 404(b), evidence of other crimes, wrongs, or acts is not admissible to prove the char-

acter of a person in order to show that he or she acted in conformity therewith; however, this evidence may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. For evidence of other crimes or bad acts to be admissible under Rule 404(b), such evidence must be independently relevant, and the probative value of the evidence must outweigh any danger or unfair prejudice. *Gaines v. State,* 340 Ark. 99, 8 S.W.3d 547 (2000); *Hudson v. State,* 85 Ark.App. 85, 146 S.W.3d 380 (2004). The admission or rejection of other crimes is left to the sound discretion of the trial court and will not be reversed on appeal absent a manifest abuse of discretion. *Hudson, supra.*

In the present case, evidence that Howard had been frequenting the Coach department, purchasing numerous Coach purses, repeatedly attempting to obtain damaged or discounted Coach purses, and entering the Coach stockroom in violation of company policy was independently relevant to demonstrate her plan, motive, opportunity, and intent to steal the Coach handbags from the stockroom. The testimony and evidence clearly showed that Howard had a particular fondness for Coach handbags and a determination to amass a number of them, and her prior conduct—most notably the rummaging around in the stockroom—was relevant to show that she knew where the purses were, how to get to them, and which ones she wanted. Accordingly, we conclude that the circuit court did not abuse its discretion in allowing the testimony over Howard's objection.

Affirmed.

GLOVER and ABRAMSON, JJ., agree.